DANIEL S. LIM (Cal. Bar No. 292406)
Email: limda@sec.gov
CHRISTOPHER A. NOWLIN (Cal. Bar No. 268030)
Email: nowlinc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Katharine Zoladz, Associate Regional Director
Gary Y, Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**F I L E D**
CLERK, U.S. DISTRICT COURT

May 16, 2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____DVE_____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Southern Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>    vs.<br><br>INTEGRATED NATIONAL RESOURCES, INC. dba WEEDGENICS, ROLF MAX HIRSCHMANN aka "MAX BERGMANN," PATRICK EARL WILLIAMS,<br><br>            Defendants, and<br><br>WEST COAST DEVELOPMENT LLC, INR CONSULTING LLC (WYOMING ENTITY), OCEANS 19 INC., AUTOBAHN PERFORMANCE LLC, ONE CLICK GENERAL MEDIA INC., OPUS COLLECTIVE, JOHN ERIC FRANCOM, INR-CA INVESTMENT HOLDINGS, LLC, MICHAEL DELGADO, TOTAL SOLUTION CONSTRUCTION LLC, BAGPIPE HOLDINGS LLC, BAGPIPE MULTIMEDIA LLC, TYLER CAMPBELL, INR CONSULTING LLC (CALIFORNIA ENTITY), HIDDEN SPRINGS HOLDINGS GROUP LLC, and ALEXANDRIA PORTER BOVEE aka "AIA MONTGOMERY,"<br><br>            Relief Defendants. | Case No.   **8:23-cv-00855-JWH (KESx)**<br><br>**COMPLAINT**<br><br>**(FILED UNDER SEAL)** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Relief Defendants Michael Delgado and Tyler Campbell reside in this district, and RDs Total Solution Construction LLC, Bagpipe Multimedia LLC, INR Consulting LLC/Campbell, and Hidden Springs Holdings Group LLC, have their principal places of business in this district.

## SUMMARY

4.      This SEC enforcement action is being brought to stop an ongoing Ponzi-like scheme, where defendants have lied about the existence of, revenue from, and permits associated with INR facilities that supposedly cultivated cannabis in Adelanto, California, and Las Vegas, Nevada, and deceitfully used investor funds to enrich themselves rather than to fund their purported business.  The federal securities laws vest in this Court the power to enjoin, on an emergency basis, further violations of law.  The Court also has the equitable authority to freeze the assets of securities law violators, freeze the assets of Relief Defendants ("RDs") who received significant

investor funds, order defendants and RDs to provide a sworn accounting of their financial affairs, and prohibit defendants and RDs from destroying relevant documents.  Because defendants continue to raise money from investors, and have a history of quickly dissipating investor funds for their personal use, the SEC now brings this action to secure that emergency relief in this Court.

5.     From in or around June 2019 to April 2023, defendants Patrick Earl Williams ("Williams") and Rolf Max Hirschmann, also known as "Max Bergmann" ("Hirschmann"), along with Integrated National Resources, Inc. (dba "WeedGenics") ("INR"), the entity they control or represent, have raised approximately $61.7 million—including over $22.4 million from November 2022 to April 2023—from approximately 350 investors nationwide.

6.     During this raise, defendants claimed that investor funds would be used to develop and expand a cannabis cultivation facility in Adelanto, California, the expansion would generate regular interest payments for investors, INR's facilities in both California and Nevada were profitable and making millions in revenue each year, and the investments were stable and guaranteed.  Defendants also represented that they had the requisite licenses and permits necessary to operate such facilities.  In truth, however, all of this was a sham.

7.     Investor funds were not used to develop or expand any cultivation facility, as defendants had promised.  Instead, once investor money was received by accounts controlled by defendants, those funds were deliberately transferred to multiple other accounts, dizzyingly back and forth from defendants' to RDs' and vice versa.  This circuitous movement of money was intended to obfuscate the truth: investor funds were being used to pay personal expenses and to pay off other investors.  From purchasing luxury cars to financing residential upgrades to paying for jewelry and adult entertainment, defendants and RDs spent tens of millions of dollars in investor money on items having nothing to do with a grow/cultivation facility.  Further, over $16 million of investor money was spent on Ponzi-like

distributions.

8.     And contrary to defendants' representations, INR's facilities are non-existent.  Defendants never owned or operated a cultivation facility.  While defendants offered up financials, locations, and even photographs of purported facilities, none of them ever belonged to or was associated with defendants.  Thus, defendants' claims that these facilities generated tens of millions of dollars came from thin air.

9.     Further, the State of California, State of Nevada, and City of Adelanto each have specific licensing and permitting requirements for the growth and sale of cannabis; despite their representations, defendants never complied with any of these requirements.

10.     Accordingly, investments in INR were inherently unstable and doomed from the start.

11.     To avoid detection and maintain this charade, defendants tried to hide their involvement from investors.  Hirschmann—INR's investor relations representative—used a fake name ("Max Bergmann") the entire time he communicated with investors.  Patrick Williams—the vice president of INR whose name, title, and role as a core principal is highlighted on offering memoranda, investor agreements, and other company records—worked behind the scenes and was content with Hirschmann's fake persona being the face of the company.

12.     In September and October 2022, INR purportedly underwent a restructuring and unilaterally changed the terms of the investor agreements.  Instead of INR paying investors fixed interest payments on principal investments monthly, as it promised, defendants told investors to choose between a gradual return of only principal, or a conversion to some fictitious "preferred stock" in the company.

13.     In November 2022, after having alienated investors with this deceptive change to their investment, INR started to raise money from other investors through a different account, controlled by an RD.  This fraud is ongoing, with RD bank

accounts receiving investor funds, which are then funneled through a byzantine maze of transfers, ultimately and unlawfully to the benefit of defendants and RDs.

14.     By engaging in the conduct alleged herein, defendants violated the antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and RDs have unjustly retained investor funds that they have no legitimate entitlement to.

15.     To halt defendants' unlawful conduct and preserve the status quo, the SEC seeks: a temporary restraining order and preliminary injunction prohibiting the defendants from violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; a temporary restraining order and preliminary injunction prohibiting defendants Williams and Hirschmann from participating in the issuance, purchase, offer, or sale of any security in an unregistered offering; an order freezing defendants' and RDs' assets; an accounting by the defendants and RDs; a document preservation order against the defendants and RDs prohibiting the destruction or alteration of documents; expedited discovery; and appointment of a permanent receiver over INR and the entity-RDs.  The SEC also seeks an order: requiring defendants to jointly and severally disgorge their ill-gotten gains, along with pre-judgment interest; requiring RDs to disgorge ill-gotten funds received by them to which they have no legitimate claim, along with pre-judgment interest; and imposing civil penalties on defendants.

## **DEFENDANTS**

16.     **INR** is a Delaware corporation that was previously registered in Wyoming before transferring its registration to Delaware in October 2022.  INR touts itself as a company engaged in the business of cannabis cultivation and distribution, with purported cultivation facilities in Las Vegas, Nevada and Adelanto, California.

17.     **Williams**, age 34, is a resident of St. Petersburg, Florida.  Williams holds himself out publicly as the vice president of INR, and INR's corporate entity

filings describe Williams as INR's president and chairman of the board. Williams is the sole signatory on INR's bank accounts that received investor funds and made interest payments to investors. Williams also has a public, online presence known as "BigRigBaby."

18. **Hirschmann**, age 52, is a resident of Eagle, Idaho. Hirschmann holds himself out to investors as "Max Bergmann," and serves as INR's primary investor relations representative.

## RELIEF DEFENDANTS

19. **West Coast Development LLC ("WCD")** is a Wyoming limited liability company that was formed in April 2019. Williams is the sole manager of WCD and the sole authorized signer on multiple bank accounts in the entity's name. WCD received approximately $15,275,000 of investor funds.

20. **INR Consulting LLC (Wyoming Entity) ("INR Consulting/Williams")** is a Wyoming limited liability company that was formed in January 2023. Williams is the sole manager of INR Consulting/Williams and the sole authorized signer on the bank account in the entity's name. INR Consulting/Williams received approximately $2,765,000 of investor funds.

21. **Oceans 19 Inc. ("Oceans 19")** is a Wyoming corporation that was formed in August 2019. Hirschmann is the sole owner of Oceans 19 and the sole authorized signer on multiple bank accounts in the entity's name. Oceans 19 purports to be in the business of "Internet Marketing and Consulting Services." Oceans 19 received more than $22,206,000 of investor funds.

22. **Autobahn Performance LLC ("Autobahn")** is a Wyoming limited liability company that was formed in December 2020. Hirschmann is the sole member and manager of Autobahn. Hirschmann and his wife are signatories on Autobahn bank accounts. Autobahn received approximately $9,217,000 of investor funds.

23. **One Click General Media Inc. ("One Click")** is a Nevada corporation

5

that was formed in 2014 and has since been dissolved. Hirschmann was the president of One Click and the sole authorized signer on its bank account. One Click received approximately $801,000 of investor funds.

24.  **Opus Collective ("Opus")** is a Wyoming corporation that was formed in July 2020. Hirschmann is the sole owner and president/director of Opus, and both Hirschmann and his wife are signatories on Opus's bank account. Opus received approximately $605,000 of investor funds.

25.  **John Eric Francom ("Francom")**, age 40, is a resident of Forney, Texas. Francom received investor funds into accounts that he controlled.

26.  **INR-CA Investment Holdings, LLC ("INR-CA")** is a Delaware limited liability company that was formed in October 2022. Starting in November 2022, a bank account in the name of INR-CA, for which Francom is the sole authorized signer, began receiving millions of dollars of what appear to be investor funds. INR-CA received approximately $21.2 million from investors.

27.  **Michael Delgado ("Delgado")**, age 41, is a resident of Orange, California. Delgado personally received investor funds.

28.  **Total Solution Construction LLC ("Total Solution")** is a California limited liability company that was formed in Orange in July 2021. Delgado is the sole manager of Total Solution and the sole authorized signer on the entity's bank accounts. Total Solution purports to be in the construction business. Total Solution Construction received approximately $3,867,000 in investor funds.

29.  **Bagpipe Holdings LLC ("Bagpipe Holdings")** is a Wyoming limited liability company that was formed in November 2019. Delgado is the sole manager of Bagpipe Holdings and the sole authorized signer on the entity's bank accounts. Bagpipe Holdings received approximately $1,213,000 of investor funds.

30.  **Bagpipe Multimedia LLC ("Bagpipe Multimedia")** is a California limited liability company that was formed in Orange in November 2022. Delgado is the sole member and manager of Bagpipe Multimedia and the sole authorized signer

on the entity's bank accounts.  Bagpipe Multimedia received approximately $2,181,000 of investor funds.

31.    **Tyler Campbell ("Campbell")**, age 35, is a resident of Norwalk, California.  Campbell personally received investor funds.

32.    **INR Consulting LLC (California Entity) ("INR Consulting/Campbell")** is a California limited liability company that was formed in Orange in December 2021.  Campbell is the sole manager and chief executive officer of INR Consulting/Campbell, and he is the sole authorized signer on the entity's bank accounts.  INR Consulting/Campbell purports to be in the construction business.  INR Consulting/Campbell received approximately $9,080,000 of investor funds.

33.    **Hidden Springs Holdings Group LLC ("Hidden Springs")** is a California limited liability company that was formed in Orange in February 2023. Tyler Campbell is the sole manager of Hidden Springs.  Hidden Springs received approximately $384,000 of investor funds.

34.    **Alexandria Porter Bovee, also known as "Aia Montgomery" ("Bovee")**, age 37, is a resident of Las Vegas, Nevada or Dalzell, South Carolina. Bovee began communicating with INR investors around September 2022 in an effort to get them to restructure their investments, and she received approximately $715,000 of investor funds directly from the INR and INR/Campbell accounts.

## FACTUAL ALLEGATIONS

### A.    INR Investments

35.    From in or around June 2019 to at least April 2023, INR, which also went by "WeedGenics," advertised opportunities to invest in its cannabis cultivation and retail distribution business through its online website and other investment forums/websites.

36.    Once prospective investors reached out to INR through these channels, Hirschmann interacted with them and became their primary INR contact. Hirschmann never revealed his true name during these interactions, and instead went

by the fake name "Max Bergmann."

37. Hirschmann engaged in various email, telephone, and in-person conversations with prospective and actual investors.

38. Hirschmann also provided prospective investors with written offering materials concerning INR's cannabis cultivation and dispensary business—which purportedly included facilities in Adelanto, California, and Las Vegas, Nevada—and highlighting actual and potential profits.

39. Hirschmann also provided prospective investors with *pro forma* financial spreadsheets that purported to detail revenues and expenses for INR's facilities.

40. Hirschmann and the INR written offering materials offered prospective investors the opportunity to invest in the further development and expansion of INR's cannabis cultivation facility in Adelanto, California.

41. INR investors entered into written agreements for a five-year term that specified the investment was "for the purpose of operating additional marijuana grow facility(s)" and cross-referenced the terms of the written offering materials.

42. INR—through representatives like Hirschmann, written offering materials, and/or investor agreements—guaranteed investors fixed annual interest rates between 19.5% and 36%, and sometimes offered additional equity and revenue sharing interests. After 60 consecutive monthly disbursements, investors had the choice to renew their investment for another five-year term or have their full initial investment capital returned.

43. While Hirschmann coordinated the process by which the investors received and signed their investor agreements, Williams signed the actual agreements on behalf of INR as its vice president. These INR investor agreements cross-referenced and incorporated by reference the statements contained in INR's written offering materials.

44. Further, INR's offering materials provided to investors identified

defendant Williams as a core principal and vice president of INR.

45.     Additionally, INR's website identified defendant Williams as a core principal, early founder, and vice president of the company.

**B.    Defendants' Material Misrepresentations and Omissions**

**1.    Defendants' False Statements and Misrepresentations to Prospective Investors Regarding INR's Facilities, Profits, Compliance, and Use of Investor Funds**

46.     During the relevant period, INR, Hirschmann, using the fake name "Max Bergmann," and Williams each made material misrepresentations—though official INR forms, emails, and/or in-person and telephone conversations—to prospective investors about INR's business, success, and use of investor funds.

47.     Starting no later than in mid-2020, INR and Hirschmann distributed to prospective investors INR Offering Memoranda that named Williams as a core principal and vice president, and also made the following representations:

a.      INR had a current Las Vegas, Nevada facility that covers 52,000 square feet and generates consistent annual revenue of $18 million (the "Las Vegas Facility").

b.      INR had secured a 110,000-square-foot space in an industrial park in Adelanto, California for purposes of growing and cultivating marijuana/cannabis (the "Adelanto Facility").

c.      The Adelanto Facility would encompass 150,000 square feet and increase INR's gross revenue to $54 million annually.

d.      The entire Adelanto Facility had "an approved Conditional Use Permit for Cultivation, Distribution, Testing, and/or Manufacturing."

e.      INR was offering "ownership/investment positions" for an aggregate sum of $18.75 million, representing 50% of capital requisite ($37.5 million) to build out the Adelanto Facility.

f.      Investor funds would be used to develop the Adelanto Facility,

which development would take part in five phases, with investor funds capped at $3.75 million for each phase, and utilized prior to commencement of the next phase.

       g.    A minimum of $25,000 was required to "purchase space" in the Adelanto Facility.  The investment was subject to a five-year minimum term, with fixed interest payments (ranging from 19.5% to 36% interest, depending on the initial investment) issued monthly.

       h.    Investors could also buy "equity/ownership positions," or a "square foot possession," in the Adelanto Facility, at a rate of $250 per square foot.

       i.    INR was not "subject to the volatility of stock markets," and its cultivation facilities produced "consistent positive cash flow."

       j.    INR enjoyed "strong financial performance" and "high profit margins."

48.    INR and Hirschmann also distributed to prospective investors an October 2020 INR spreadsheet that made the following representations:

       a.    INR's Las Vegas Facility was generating over a million dollars in revenue monthly.

       b.    The Adelanto Facility would begin generating revenue in November 2020.

       c.    The Adelanto Facility's revenue would peak at $2.5 million per month by April 2022.

       d.    The Las Vegas Facility incurred millions of dollars in operating costs annually for, among other things, growth and cultivation of marijuana/cannabis, rent, utilities, and licenses and related fees.

49.    No later than in early 2022, INR and Hirschmann distributed to prospective investors an INR Investment Summary that made the following representations:

       a.    INR's operations consisted of two divisions, which collectively brought in a total gross revenue of $50.3 million in 2020: cannabis cultivation and

retail distribution.  The cannabis cultivation division derived its revenue, in part, from the Las Vegas Facility.

b.     The cannabis cultivation division generated $14.9 million in revenue in 2017, continued to grow annually, and generated $17.2 million in revenue in 2020.  The retail distribution division generated $10.7 million in revenue in 2017, continued to grow annually, and generated $33.1 million in revenue in 2020.

50.     INR and Hirschmann also distributed to prospective investors a March 2022 INR spreadsheet that made the following representations:

a.     The Las Vegas Facility had a 2021 annual revenue of more than $20 million.

b.     The Adelanto Facility had a 2021 annual revenue of more than $16 million.

c.     The Adelanto Facility was generating and would continue to generate $3 million in revenue monthly.

d.     INR owned assets valued at more than $119.99 million, made up of $88 million for INR's cultivation segment and $31 million for its retail segment.

51.     Hirschmann, still going by "Max Bergmann," took prospective investors on a tour of the purported Las Vegas Facility in October 2020, and referred to it as "our grow facility."

52.     From 2020 to 2022, INR and Hirschmann distributed INR Investor Agreements, which were eventually signed by investors and countersigned by Williams as the vice president of INR.  These agreements contained the following representations:

a.     The investment amount was subject to a five year term, and the investor was entitled to a monthly interest payment ranging from 19.5% to 36%.

b.     Upon receipt of 60 consecutive disbursements, the investor could withdraw the full value of the original investment.

c.     The funds invested would be used "for the purpose of opening

11

additional marijuana grow facility(s)" or "for the purpose of opening additional marijuana grow facility(s) described as 'Adelanto 2.'"

53.   Also from 2020 to 2022, Hirschmann made the following representations on behalf of INR to prospective investors either in person, over the phone, and/or or via e-mail:

a.   INR never missed an interest payment to investors in its purported many years of operation.

b.   INR interest payments were guaranteed based on past performance.

c.   The interest payments would come from the revenue generated from INR's facilities, including the Adelanto Facility.

d.   As of October 6, 2020, the Adelanto Facility was beginning Phase 2 of its buildout or expansion, regular interest disbursements would be issued on the 15th of every month, and both the Adelanto and Las Vegas Facilities "are operated under [INR]."

e.   Investment funds would be used solely for the planned development of the Adelanto Facility.

54.   The above statements and representations from INR, Hirschmann (using the fake name "Max Bergmann"), and Williams regarding the existence and financial success of INR's Adelanto and Las Vegas Facilities (collectively, the "Facilities") were false and misleading because the Facilities did not exist and therefore did not generate revenue.

55.   Further, the above statements and misrepresentations from INR, Hirschmann, and Williams, regarding the lawful status of INR's Facilities were false and misleading because the Facilities were never properly permitted or licensed.

56.   Notably, the City of Adelanto, State of California, and State of Nevada all require entities and individuals to obtain specific permits or licenses before operating a cannabis/marijuana cultivation facility.  INR never obtained any such

permits or licenses.

57.     A reasonable investor would have wanted to know that the Facilities did not exist, did not generate revenue, and never had the required permit/license to operate; all of these facts would be significant to a reasonable investor's decision to invest.

58.     Also, the above statements and representations from INR, Hirschmann, and Williams regarding how investor funds would be used to expand the Adelanto Facility were false and misleading because those funds were instead spent on unrelated matters, including personal expenses, transfers to other defendant and RD accounts, and Ponzi-like payments, as described below.

59.     A reasonable investor would also have wanted to know that defendants spent investor funds on matters unrelated to the Adelanto Facility, including personal expenses, transfers to other defendant and RD accounts, and Ponzi-like payments; all of these facts would be significant to a reasonable investor's decision to invest.

60.     Finally, the above statements and representations from INR, Hirschmann, and Williams regarding the stability of the investments were false and misleading because the Adelanto Facility did not exist, did not generate revenue, and lacked the requisite permits and licenses, rendering all investments inherently unstable and illusory.

61.     A reasonable investor would also have wanted to know that their investments were unstable because the Adelanto Facility did not exist, did not generate revenue, and lacked the requisite permits and licenses; all of these facts would be significant to a reasonable investor's decision to invest.

62.     As a result of these false statements and misrepresentations, investors invested and reinvested funds in INR through Hirschmann.

63.     Defendants acted knowingly, recklessly, and negligently in making material misstatements and omissions concerning the existence, financial success, and legal status of INR's Adelanto and Vegas Facilities, the stability of investments

13

into INR and the Adelanto Facility, and the use of investor funds.  Defendants also failed to exercise reasonable care to ensure that investors were not deceived as to this information.

64.    At all relevant times, Hirschmann was INR's investor relations representative and core principal—as stated in INR documents distributed to investors—and INR acted through Hirschmann.  Further, Williams was INR's vice president and core principal—as stated in INR documents distributed to investors. Therefore, Hirschmann and Williams' knowledge, recklessness, and negligence can be imputed to INR.

## 2.    Defendants' False Statements and Misrepresentations to Actual Investors Regarding INR's Facilities, Profits, and Use of Investor Funds

65.    Similar misrepresentations continued even after investors gave their money to INR.

66.    Hirschmann—on behalf of INR and still using the fake name "Max Bergmann"—made the following representations to actual investors either in person, over the phone, and/or or via e-mail:

a.    As of March 24, 2021, with respect to the Adelanto Facility expansion, "Phase 1 is harvesting the first crop this month, with additional rotations producing monthly," "Phase 2 has an array of strains from clones maturing to the adult/budding phase, and Phase 3 was underway.

b.    As of June 23, 2021, the Adelanto Facility expansion was in Phase 4, and investors could receive "a share of the gross revenue from" the Adelanto Facility, in addition to regular interest payments.

c.    As of October 28, 2021, the Adelanto Facility expansion was in Phase 5, and investors could receive "up to 4x equity on the dollar."

d.    As of March 24, 2022, INR was "wrapping up phase 5" of the Adelanto Facility expansion and Phases 1-5 was a "smashing success," the Adelanto

14

Facility had "already surpassed revenue projections in January 2022," and INR had secured "3 more units in addition to the existing 5 for a total of 240,000 sq ft."

e.   As of March 25, 2022, INR investors could earn a "revenue share" on top of regular interest payments, and for purposes of equity distribution, phases 6, 7, and 8 of the Adelanto Facility expansion would be identified as "Adelanto 2."

f.   As of June 2, 2022, INR secured space for phases 9 and 10 of the Adelanto Facility expansion, and "the time is NOW" to invest in the equity "buy in."

g.   As of August 2022, there were still revenue sharing opportunities related to the Adelanto Facility.

h.   INR owned the Las Vegas Facility.

67.   INR also emailed monthly account statements to investors, which statements showed the purported equity held by the investors, revenue generated by the Facilities, and financial well-being and growth of INR.

68.   The above statements and representations from INR and Hirschmann regarding the existence and financial success of INR's Facilities were false and misleading because such facilities did not exist and did not generate revenue.

69.   A reasonable investor would have wanted to know that the Adelanto and Las Vegas did not exist and did not generate revenue; these facts would have been significant to a reasonable investor's decision to invest.

70.   The above statements and representations from INR and Hirschmann regarding how investor funds would be used to expand the Adelanto Facility were false and misleading because those funds were instead used for unrelated matters, including personal expenses, transfers to other defendant and RD accounts, and Ponzi-like payments, as described below.

71.   A reasonable investor would also have wanted to know that defendants used investor funds for unrelated matters, including personal expenses, transfers to other defendant and RD accounts, and Ponzi-like payments; these facts would have been significant to a reasonable investor's decision to invest.

72.     As a result of these false statements and misrepresentations, investors invested and reinvested funds in INR through Hirschmann.

73.     Defendants INR and Hirschmann acted knowingly, recklessly, and negligently in making material misstatements and omissions concerning the existence and financial success of INR's Adelanto and Vegas Facilities, and the use of investor funds, and failed to exercise reasonable care to ensure that investors were not deceived as to this information.

74.     At all relevant times, Hirschmann was INR's investor relations representative and core principal—as stated in INR documents distributed to investors—and INR acted through Hirschmann.  Therefore, his knowledge, recklessness, and negligence can be imputed to INR.

## C.     Defendants' Misappropriation and Ponzi-Like Payments of Investor Funds Raised from June 2019 to October 2022

75.     Between June 2019 and May 2022, INR raised approximately $2.3 million from approximately 20 investors through RD WCD's bank account controlled by Williams.

76.     Between December 2019 and late October 2022, INR raised approximately $36.9 million from approximately 230 investors through INR's bank account also controlled by Williams.

77.     From June 2019 to October 2022, Williams transferred investor funds to bank accounts controlled by himself and his entities, Hirschmann and his entities, and RDs and their entities.

78.     Williams and RD WCD received approximately $7,948,000 million in investor funds, of which approximately $625,000 was spent on dining, jewelry, adult entertainment, and other personal expenses.  Williams also spent more than $18,000 on his music career, including payments to producers, DJs, and iHeart Media. Further, approximately $1,976,000 of the investor funds were transferred to Williams' personal bank accounts or withdrawn in cash.

79.     Hirschmann and his entities received approximately $15,673,000 in investor funds, of which approximately: $4.8 million was spent on residential real estate and related expenses (e.g., renovation, utilities, landscaping, etc.), and $2.4 million was spent on luxury cars.  Further, approximately: $3.2 million of these investor funds were used to make credit card payments, and $913,000 of the funds were withdrawn in cash.

80.     RD Delgado and his entities received approximately $5,263,000 in investor funds, of which approximately $2,209,000 was transferred to RD Delgado's personal bank account or withdrawn in cash.

81.     RD Campbell and INR Consulting/Campbell received approximately $1,181,000 in investor funds, of which substantial amounts were spent on personal expenses and cash withdrawals.

82.     Additionally, while INR continued to solicit investments, Williams used investor funds to make investor distributions/interest payments.

83.     From June 2019 to October 2022, INR spent approximately $10 million in investor funds on distributions/interest payments to investors.

84.     RD WCD, controlled by Williams, spent approximately $1.6 million in investor funds on distributions/interest payments to investors.

**D.     Defendants' Unilateral Restructuring of Investments**

85.     Starting in September 2022, RD Alexandria Bovee, who identified herself to investors as "Aia Montgomery" ("Bovee"), contacted investors on behalf of INR regarding a restructuring of their investments.

86.     Specifically, Bovee noted that INR was "going through major changes," and that investor payments would also undergo changes as a result.

87.     Bovee eventually clarified to investors that they had two options: convert their debt positions with INR into "preferred stock" equity positions for which they would no longer receive monthly interest payments; or reach some sort of withdrawal arrangement with INR.

88.    Hirschmann reassured investors that Bovee's comments about restructuring were "valid," and confirmed for them that she was "the point of contact for the executive team and [INR]'s legal department."

89.    Bovee indicated to investors that the restructuring was necessary because INR was in the early stages of going public.

90.    Indeed, on September 28, 2022, INR filed a Form D with the Securities and Exchange Commission, indicating that it was offering $60 million in equity pursuant to an exemption from registration under Rule 506(b) of Regulation D.

91.    Notably, when investors who were told about the restructuring notified Bovee that they had not received interest payments for many months and wanted a return of their principal immediately, Bovee noted that INR's response would be "no."

92.    Instead, INR, through Bovee and others, offered investors who did not want to convert their debt positions into "preferred stock" a gradual return of principal over many years.

93.    INR also hired an attorney, who communicated and negotiated with investors about such withdrawal arrangements.

94.    Some investors agreed to this withdrawal agreement, which agreement was signed by Williams as INR's vice president.

95.    INR's attorney sent detailed documentation to investors about INR's purported business and the proposed conversion of investments into preferred stock.

a.    The documentation included an August 2022 private placement memorandum that indicated INR owned and operated the Las Vegas and Adelanto Facilities, gave actual and projected revenues from the same, and made representations that INR had cannabis-related licenses needed to operate its business lawfully.

b.    The documentation also included subscription agreements that included a signature space for Williams as INR's vice president and identified

Williams as the owner of over 50% of INR's issued and outstanding shares.

96.     For her work, Bovee received over $715,000, all or almost all of it in investor funds, from the INR and RD INR Consulting/Campbell bank accounts.

**E.      Defendants Continued to Raise, Misappropriate, and Issue Ponzi-Like Payments of Investor Funds Raised from November 2022 to April 2023**

97.     INR's bank account was the primary vehicle for receiving investor funds until around November 2022, when RD INR-CA's bank account—controlled by RD Francom—began to receive the bulk of investor funds.

98.     From November 2022 to April 2023, RD Francom's INR-CA received approximately $21.2 million from roughly 110 investors.  Just as in the previous raise, these investor funds were used for improper purposes.

99.     Of that $21.2 million, RD Francom's INR-CA sent over $15 million to the primary Williams-controlled INR bank account, and over $6 million to RD INR Consulting/Campbell.

100.    Williams and RD WCD again received millions of dollars, much of which was passed through to Hirschmann and other RDs, and approximately $3,708,000 of which was directed to Williams' personal bank account.

101.    Hirschmann and his entities received approximately $7,271,000, of which approximately: $1,389,000 was spent on luxury automobiles, $1,248,000 was used to pay credit cards, and $640,000 was spent on real estate and related expenses (e.g., renovation, utilities, landscaping, etc.).

102.    RD Delgado and his entities received approximately $1,984,000, much of which was spent on personal expenses.

103.    RD INR Consulting/Campbell received approximately $8,001,000, of which approximately: $537,000 was transferred to RD Campbell's personal bank accounts or withdrawn in cash, nearly $1 million was transferred to third parties for unknown purposes, and—starting in February 2023—$384,000 was used to form RD

Hidden Springs.

104.   INR and RD WCD also used investor funds, mostly consisting of money from RD INR-CA, to fund at least $1,680,000 in payments to INR investors.

105.   Moreover, INR sent back $386,000 to INR-CA, which made payments to INR investors who invested directly through INR-CA.

106.   Similarly, INR Consulting/Campbell likewise sent $1,046,000 back to INR-CA, which again made payments to INR investors who invested directly through INR-CA.

107.   INR Consulting/Campbell also made approximately $1,779,000 in payments directly to INR investors, including through checks that RD Campbell personally signed.

**F.   Totals Unlawfully Raised, Spent, and Distributed**

108.   From June 2019 to April 2023, defendants raised, directly or indirectly, approximately $61.7 million.

109.   From February to March 2023, RD Francom's INR-CA received $5.8 million, and continues to receive investor funds as of April 2023.

110.   While large sums of money were transferred back and forth between defendants' and RDs' bank accounts, the table below shows: the gross amounts of investor funds received by each individual and his or her associated entities; the sources of those investor funds; and how certain investor funds were spent:

| Recipients | Total Amount Received (Approximate) and Sources | Use of Funds from 2019 to Present (Approximate) |
|---|---|---|
| Defendant Williams, his RD Entities (WCD and INR Consulting/Williams) and his personal bank accounts | $19,235,000 from investors and INR | • $5,684,000 in cash withdrawals and transfers to Williams' personal accounts<br>• $625,000 on dining, jewelry, adult entertainment, etc.<br>• $540,000 in net Zelle/wire transactions for unknown purposes.<br>• $11,420,000 in transfers to Defendants/RDs |

| Recipients | Total Amount Received (Approximate) and Sources | Use of Funds from 2019 to Present (Approximate) |
| --- | --- | --- |
| | | • $1,617,000 in Ponzi-like payments to investors by WCD<br>• $116,000 for limousine services |
| Defendant Hirschmann and his RD Entities (Oceans 19, Autobahn, One Click, and Opus) | $22,944,000 from INR and WCD | • $5,482,000 on residential real estate and renovations<br>• $3,810,000 on luxury automobiles<br>• $1,040,000 in cash withdrawals<br>• $1,042,000 in payments to women<br>• $4,449,000 in credit card payments<br>• $205,000 in travel and entertainment |
| RD Delgado, his RD entities (Total Solution, Bagpipe Holdings, Bagpipe Multimedia), and his personal bank accounts | $7,247,000 from INR, WCD, and INR Consulting/Campbell | • $2,529,000 in cash withdrawals and transfers to Delgado's personal accounts<br>• $986,000 in net Zelle/wire transactions for unknown purposes<br>• $212,000 for jewelry, retail, and entertainment<br>• $856,000 for construction not linked to cannabis |
| RD Campbell, his RD entities (INR Consulting/Campbell and Hidden Springs) and his personal bank accounts | $9,183,000 from INR, Total Solution, and Bagpipe Holdings | • $1,091,000 in cash withdrawals and transfers to Campbell's personal accounts<br>• $55,000 for motorcycles and/or cars<br>• $173,000 for construction not linked to cannabis<br>• $1,779,000 in Ponzi-like payments to INR investors<br>• $1,046,000 back to Francom's INR-CA, then used to fund Ponzi-like payments to investors<br>• $660,000 in transfers to Hirschmann's Ocean's 19<br>• $330,000 to Delgado and his entities |
| RD Alexandria Bovee and her personal account | Over $715,000 from INR and INR Consulting/Campbell | • All to personal account |

111. Further, in total, approximately $16,110,000 in investor funds were used to pay distributions/interest payments to investors.

### G.   The Scheme to Defraud Investors

112. Defendants INR, Hirschmann, and Williams lied to investors to obtain their money, and spent investor money on personal expenses and transfers to RDs.

113. Defendants INR and Williams also restructured the nature of the

1  investments themselves without any regard for prior, agreed-upon terms in investor

2  agreements.

3      114.   Defendants INR, Williams, and Hirschmann made material

4  misrepresentations about the existence, success, and lawful status of INR's Facilities,

5  and also about the use of investor funds.

6      115.   During this time, Hirschmann used a fake name when interacting with

7  potential and actual investors to avoid detection.

8      116.   Further, Williams kept a low profile, working the fraud behind the

9  scenes, and offered his imprimatur to INR's offering memoranda, investor

10  agreements, and other INR documents that he knew, or should have known,

11  contained material misrepresentations.

12      117.   Additionally, Williams and Hirschmann moved investor funds to their

13  entities' and other RD-entities' bank accounts, which funds were then transferred

14  again and again, to further obfuscate their deceit.  The diagram below shows the

15  circuitous path—if not intentional morass—of investor money flow, statuses of the

16  various accounts (i.e., open, closed, approximate amounts remaining) as of April

17  2023, and the interconnectedness of defendants and RDs:



18

19

20

21

22

23

24

25

26

27

28

118.   Moreover, INR and Williams restructured the agreed-upon investments, and tried to reduce INR's obligations from high-interest, monthly payments to the mere return of principal over many years.

119.   Finally, defendants caused over $16 million in Ponzi-like payments to be made to investors.

**H.     The Investments Offered and Sold by Defendants Are Securities**

120.   Based on defendants' misrepresentations, investors invested money into one or more accounts controlled by defendants and/or RDs to receive returns in the form of fixed interest rates, and in some cases equity or revenue sharing.

121.   Defendants pooled the investor funds—which investors believed would be used solely for the expansion of the Adelanto Facility—together in various bank accounts.

122.   The managerial efforts of the purported Adelanto Facility expansion were to be led entirely by defendants, who touted INR's success and experience operating cannabis grow facilities.

123.   Whether investors would profit from their investments was dependent on whether the Adelanto Facility expansion would be profitable.  Indeed, both investors and defendants were supposed to have achieved profits from INR's Adelanto Facility; in this way, their fortunes were linked.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against all Defendants)**

124.   The SEC realleges and incorporates by reference paragraphs 1 through 123 above.

125.   In the course of soliciting investor funds for INR's Adelanto Facility expansion, defendants INR, Hirschmann, and Williams made material misrepresentations and omissions about: the existence, financial success, and lawful

status of INR's Adelanto and Las Vegas Facilities; the stability of investments in INR; and how investor funds would be used solely to finance the Adelanto Facility expansion.  In truth, INR never owned or operated such facilities, INR never had the licenses or permits required to operate cannabis cultivation facilities at these locations, and investments in INR were unstable from the start.  Further, defendants diverted large sums of investor money for their personal use, to other RD accounts, and for Ponzi-like payments.

126.   Also, defendants INR, Hirschmann, and Williams engaged in a scheme to defraud by: (i) misappropriating investor money for their personal use and to make Ponzi-like payments to other investors; and (ii) engaging in other deceptive practices—namely: making material misrepresentations about the existence, financial success, and lawful status of INR's Adelanto and Las Vegas Facilities; making material misrepresentations about the stability of investments; making material misrepresentations about the use of investor funds; baiting and switching investors with fictitious equity or gradual return of principal instead of agreed-upon interest payments; and moving investor money through various accounts to avoid detection.

127.   By engaging in the conduct described above, defendants INR, Hirschmann, and Williams, with scienter, and each of them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

128.   By engaging in the conduct described above, defendants INR, Hirschmann, and Williams violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5

thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (against all Defendants)

129.   The SEC realleges and incorporates by reference paragraphs 1 through 123 above.

130.   In the course of soliciting investor funds for INR's Adelanto Facility expansion, defendants INR, Hirschmann, and Williams obtained money or property by means of material misrepresentations and omissions about: the existence, financial success, and lawful status of INR's Adelanto and Las Vegas Facilities; the stability of investments in INR; and how investor funds would be used solely to finance the Adelanto Facility expansion.  In truth, INR never owned or operated such facilities, INR never had the licenses or permits required to operate cannabis cultivation facilities at these locations, and investments in INR were unstable from the start. Further, defendants diverted large sums of investor money for their personal use, to other RD accounts, and for Ponzi-like payments.

131.   Also, defendants INR, Hirschmann, and Williams engaged in a scheme to defraud by: (i) misappropriating investor money for their personal use and to make Ponzi-like payments to other investors; and (ii) engaging in other deceptive practices—namely: making material misrepresentations about the existence, financial success, and lawful status of INR's Adelanto and Las Vegas Facilities; making material misrepresentations about the stability of investments; making material misrepresentations about the use of investor funds; baiting and switching investors with fictitious equity or gradual return of principal instead of agreed-upon interest payments; and moving investor money through various accounts to avoid detection.

132.   By engaging in the conduct described above, defendants INR, Hirschmann, and Williams, and each of them, directly or indirectly, in the offer or

sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

133.   Defendants INR, Hirschmann, and Williams: with scienter or negligence, employed devices, schemes, and artifices to defraud; with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and, with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

134.   By engaging in the conduct described above, defendants INR, Hirschmann, and Williams violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

### **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that defendants committed the alleged violations.

### **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, temporarily, preliminarily, and permanently enjoining defendants INR, Hirschmann, and Williams, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who

receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and preliminarily and permanently enjoining defendants Williams and Hirschmann from directly or indirectly, including but not limited to, through any entity owned or controlled by defendants Williams or Hirschmann, respectively, from participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by any issuer, provided, however, that such injunction shall not prevent them from purchasing or selling securities for their own personal accounts.

### III.

Issue an order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Sections 2l(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting defendants Williams and Hirschmann from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

### IV.

Issue, in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order and a preliminary injunction freezing the assets of defendants and relief defendants, requiring accountings from each of the defendants and relief defendants, prohibiting defendants and relief defendants from destroying relevant documents, granting expedited discovery, and appointing a permanent receiver over INR and the entity relief-defendants.

### V.

Issue, in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order and a preliminary injunction freezing the assets of defendants and relief defendants, requiring accountings from each of the defendants and relief defendants,

prohibiting defendants and relief defendants from destroying relevant documents, granting expedited discovery, and appointing a permanent receiver over INR and the entity relief-defendants.

## VI.

Order defendants INR, Williams, and Hirschmann to jointly and severally disgorge their ill-gotten gains, together with prejudgment interest thereon, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

## VII.

Order relief defendants to disgorge ill-gotten funds received by them to which they have no legitimate claim, together with prejudgment interest thereon, pursuant to Sections 21(d)(3)(A)(ii), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3)(A)(ii), 78u(d)(5), and 78u(d)(7)].

## VIII.

Order defendants INR, Williams, and Hirschmann to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IX.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

///
///
///
///
///
///

**X.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  May 16, 2023

/s/ Daniel S. Lim

DANIEL S. LIM
CHRISTOPHER A. NOWLIN
GARY Y. LEUNG
Attorneys for Plaintiff
Securities and Exchange Commission