DANIEL S. LIM (Cal. Bar No. 292406)
Email:  limda@sec.gov
CHRISTOPHER A. NOWLIN (Cal. Bar No. 268030)
Email:  nowlinc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Katharine E. Zoladz, Associate Regional Director
Gary Y. Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

```
F I L E D
CLERK, U.S. DISTRICT COURT

May 16, 2023

CENTRAL DISTRICT OF CALIFORNIA
BY:            DVE        DEPUTY
```

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Southern Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>INTEGRATED NATIONAL RESOURCES, INC. dba WEEDGENICS, ROLF MAX HIRSCHMANN aka "MAX BERGMANN," PATRICK EARL WILLIAMS,<br><br>Defendants, and<br><br>WEST COAST DEVELOPMENT LLC, INR CONSULTING LLC (WYOMING ENTITY), OCEANS 19 INC., AUTOBAHN PERFORMANCE LLC, ONE CLICK GENERAL MEDIA INC., OPUS COLLECTIVE, JOHN ERIC FRANCOM, INR-CA INVESTMENT HOLDINGS, LLC, MICHAEL DELGADO, TOTAL SOLUTION CONSTRUCTION LLC, BAGPIPE HOLDINGS LLC, BAGPIPE MULTIMEDIA LLC, TYLER CAMPBELL, INR CONSULTING LLC (CALIFORNIA ENTITY), HIDDEN SPRINGS HOLDINGS GROUP LLC, and ALEXANDRIA PORTER BOVEE aka "AIA MONTGOMERY,"<br><br>Relief Defendants. | Case No. **8:23-cv-00855-JWH (KESx)**<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDERS: (1) FREEZING ASSETS; (2) APPOINTING A TEMPORARY RECEIVER; (3) REQUIRING ACCOUNTINGS; (4) PROHIBITING THE DESTRUCTION OF DOCUMENTS; AND (5) GRANTING EXPEDITED DISCOVERY; AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED AND A PERMANENT RECEIVER SHOULD NOT BE APPOINTED**<br><br>**(FILED UNDER SEAL)** |

# **TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................1

II. STATEMENT OF FACTS .....................................................................2

    A.  Background .....................................................................................2

    B.  INR's Securities Offering ...............................................................2

        1.  INR's website .........................................................................2

        2.  Defendant Rolf Max Hirschmann aka "Max Bergmann"..........3

        3.  INR's written offering materials ............................................3

        4.  INR's representations were material to investors ...................6

    C.  Defendants' Misrepresentations and Omissions to Investors ............8

        1.  There is no record of INR legally operating any
            cannabis business in California, Nevada, or the
            city of Adelanto ....................................................................8

        2.  INR's bank accounts show no operating revenue,
            expenses, or other indicators of legitimate business activity...10

    D.  INR, Hirschmann, and Williams's Scheme to Defraud .................11

    E.  Defendants' "Lulling" Efforts .......................................................13

    F.  Relief Defendants' Receipt of Investor Funds ...............................14

    G.  Red Flags for the INR Offering and Defendants' Ongoing
       Misconduct ..................................................................................17

III. ARGUMENT.......................................................................................18

    A.  The SEC Seeks a TRO in the Public Interest .................................18

    B.  The SEC Has Made a *Prima Facie* Showing That INR,
       Hirschmann, and Williams Committed Securities Fraud.................19

        1.  Defendants offered and sold securities ....................................19

        2.  Defendants made material misrepresentations and
            omissions ..............................................................................21

        3.  Defendants engaged in a scheme to defraud...........................22

        4.  Defendants acted unreasonably and with scienter ..................24

        5.  Relief defendants received investor funds for which
            they have no legitimate claim ................................................25

i

C.     A TRO Is Further Warranted Because Defendants Are Likely to Repeat Their Violations ................................................27

D.     The Other Relief Sought by the SEC Is Needed ...............................28

       1.     The Court should issue an asset freeze ....................................28

       2.     The Court should appoint an equity receiver over INR and the entity relief defendants ...................................................29

       3.     The Court should order an accounting, document preservation, and expedited discovery .....................................30

       4.     The Court should issue a conduct-based injunction against  defendants Williams and Hirschmann .......................31

IV.     CONCLUSION.............................................................................31

1

<h1 style="text-align:center"><u>TABLE OF AUTHORITIES</u></h1>

2

3 <u>**CASES**</u>

4 *Aaron v. SEC,*
    446 U.S. 680 (1980)...................................................................24
5
*Absolute Activist Value Master Fund Ltd. v. Devine,*
6    No. 2:15-cv-328-FJM-29DNF, 2015 WL 12838168
     (M.D. Fla. July 1, 2015)...........................................................27
7
*Basic Inc. v. Levinson,*
8    485 U.S. 224 (1988)..................................................................21

9 *Burnett v. Rowzee,*
     561 F. Supp. 2d 1120 (C.D. Cal. Feb. 11, 2008).....................23
10
*ChinaCast Educ. Corp. Sec. Litig.,*
11    809 F.3d 471 (9th Cir. 2015).....................................................25

12 *Cooper v. Pickett,*
      137 F.3d 616 (9th Cir. 1997).....................................................23
13
*Donell v. Ghadrdan,*
14    2013 WL 692853 (C.D.Cal. Feb. 26, 2013)..............................24

15 *FSLIC v. Sahni,*
      868 F.2d 1096 (9th Cir. 1989)..................................................19
16
*FTC v. Affordable Media, LLC,*
17    179 F.3d 1228 (9th Cir. 1999)...................................................28

18 *FTC v. Business Card Experts, Inc.,*
      2007 WL 1266636 (Apr. 27, 2007)...........................................29
19
*FTC v. H.N. Singer, Inc.,*
20    668 F.2d 1107 (9th Cir. 1982)..................................................19

21 *Hollinger v. Titan Capital Corp.,*
      914 F.2d 1564 (9th Cir. 1990)..................................................24
22
*In re Sanctuary Belize Litigation,*
23    408 F. Supp. 3d 650 (D. Md. 2019)...........................................29

24 *Johnson v. Couturier,*
      572 F.3d 1067 (9th Cir. 2009)..................................................28
25
*Middlesex Retirement Sys. v. Quest Software Inc.,*
26    527 F. Supp. 2d 1164 (C.D. Cal. 2007).....................................22

27 *SEC v. Alternate Energy Holdings, Inc.,*
      No. 1:10-CV-00621-EJL-REB, 2014 WL 2515710
28    (D. Id. May 13, 2014)...............................................................28

*SEC v. Baccam*,
   2017 WL 5952168 (C.D. Cal. June 14, 2017)...................................................26

*SEC v. Billion Coupons, Inc.*,
   No. 1:09-cv-00068-JMS-KSC at Dkt. No. 12 (D. Haw. Feb. 18, 2009)...........30

*SEC v. Blackwell*,
   No. 3:11-CV-0234-L, 2011 WL 13129084 (N.D. Tex. Feb. 11, 2011)...........27

*SEC v. Capital Consultants, LLC*,
   397 F.3d 733 (9th Cir. 2005) ...................................................................29

*SEC v. Capital Cove Bancorp, LLC*,
   No. 8:15-cv-00980-JLS-JC, 2015 WL 9704076
   (C.D. Cal. Sept. 1, 2015) ...............................................................19, 23

*SEC v. Cavanagh*,
   155 F.3d 129 (2d Cir. 1998) ....................................................................28

*SEC v. Colello*,
   139 F.3d 674 (9th Cir. 1998) ....................................................................25

*SEC v. Credit First Fund*,
   2006 U.S. Dist. LEXIS 96697 (C.D. Cal. Feb. 13, 2006) ........................29

*SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855 (9th Cir. 2001) ...................19, 21, 24

*SEC v. Eadgear, Inc.*,
   No. 3:14-CV-04294-RS, 2014 WL 6900938 (N.D. Cal. Dec. 8, 2014)...........19

*SEC v. Fehn*,
   97 F.3d 1276 (9th Cir. 1996) ...............................................................21, 27

*SEC v. Gallard*,
   No. 95 Civ. 3099 (HB), 1997 WL 767570 (S.D.N.Y. Dec. 10, 1997)...........23

*SEC v. Hickey*,
   322 F.3d 1123 (9th Cir. 2003) ...............................................................28, 29

*SEC v. Holschuh*,
   694 F.2d 130 (7th Cir. 1982) ....................................................................24

*SEC v. Homestead Props., L.P.*,
   No. SACV09-01331-CJC(MLGx), 2009 WL 5173685
   (C.D. Cal. Dec. 18, 2009) ........................................................................19

*SEC v. Horwitz*,
   No. 21-cv-02927-CAS-PD ...........................................................1, 28, 30

*SEC v. Hughes Capital Corp.*,
   124 F.3d 449 (3d Cir.1997) ....................................................................24

*SEC v. Int'l Swiss Invest. Corp.*,
   895 F.2d 1272 (9th Cir. 1990) ...............................................................28, 30

*SEC v. King*,
    No. 20-cv-02398-JVS-DFM ............................................. 1, 28, 30

*SEC v. Lyndon*,
    27 F. Supp. 3d 1062 (D. Haw. June 13, 2014) ................................ 24

*SEC v. Management Dynamics, Inc.*,
    515 F.2d 801 (2d Cir. 1975) ............................................. 18

*SEC v. Manor Nursing Ctrs., Inc.*,
    458 F.2d 1082 (2d Cir. 1972) ............................................ 28

*SEC v. Moleski*,
    Case No. 2:21-cv-01605-SVW-E, 2021 WL 6752254
    (C.D. Cal. Oct. 21, 2021) ................................................ 31

*SEC v. Muehler*,
    No. 2:18-cv-01677-CAS-SK, WL 2018 WL 1665637
    (C.D. Cal. Apr. 4, 2018) ................................................ 19

*SEC v. Murphy*,
    626 F.2d 633 (9th Cir. 1980) ............................................ 27

*SEC v. Neman*,
    2016 WL 6661174 (C.D. Cal. Jul. 15, 2016) ............................... 23

*SEC v. OwnZones Media Network, Inc.*,
    2020 WL 13311398 (C.D. Cal. Sept. 17, 2020) ........................... 25

*SEC v. Pac. West Capital Group, Inc., et al.*,
    No. 2:15-cv-02563-FMO-FFM, 2015 WL 9694808
    (C.D. Cal. Apr. 7, 2015) ................................................ 19

*SEC v. Platforms Wireless Intern. Corp.*,
    617 F.3d 1072 (9th Cir. 2010) .......................................... 21

*SEC v. R.G. Reynolds Ent., Inc.*,
    952 F.2d 1125 (9th Cir. 1991) .......................................... 20

*SEC v. Rubera*,
    350 F.3d 1084 (9th Cir. 2003) .......................................... 20

*SEC v. San Francisco Regional Center, LLC*,
    No. CV 15-2563-RS, 2015 WL 9694808 (N.D. Cal. Mar. 23, 2017) .............. 19

*SEC v. Schooler*,
    902 F. Supp. 2d 1341 (S.D. Cal. 2012) .................................. 19

*SEC v. Stanford*,
    No. 09-CV-0298 (N.D. Tex. Feb. 17, 2009) ............................... 29

*SEC v. TLC Invs. and Trade Co.*,
    179 F. Supp. 2d 1149 (C.D. Cal. 2001) ................................. 23

*SEC v. Trabulse*,
    526 F. Supp. 2d 1008 (N.D. Cal. 2007) ................................. 19

v

*SEC v. Unifund SAL,*
  910 F.2d 1028 (2d Cir. 1990) ...................................................................28

*SEC v. United Financial Group, Inc.,*
  474 F.2d 354 (9th Cir. 1973) ....................................................................27

*SEC v. Universal Financial,*
  760 F.2d 1034 (9th Cir. 1985) ..................................................................30

*SEC v. W. J. Howey Co.,*
  328 U.S. 293 (1946)..................................................................................20

*SEC v. Wang,*
  No. LA CV 13-07553 JAK (SSx), 2015 WL 12656906
  (C.D. Cal. Aug. 18, 2015) ........................................................................24

*SEC v. Wencke,*
  622 F.2d 1363 (9th Cir. 1980) ............................................................29, 30

*SEC v. Wilde,*
  No. SACV 11–0315 DOC (AJWx), 2012 WL 6621747
  (C.D. Cal. Dec. 17, 2012) .........................................................................23

*SEC v. World Capital Market, Inc.,*
  864 F.3d 996 (9th Cir. 2017) ...............................................................25, 26

*Simpson v. AOL Time Warner, Inc.,*
  452 F.3d 1040 (9th Cir. 2006),
  *vacated on other grounds,* 519 F.3d 1041 (9th Cir. 2008)................22, 23

*TSC Industries, Inc. v. Northway*, Inc.,
  426 U.S. 438 (1976)..................................................................................21

*United States v. Nutri-Cology, Inc.,*
  982 F.2d 394 (9th Cir. 1992) ....................................................................18

*United States v. Shields,*
  No. CR12-00410, 2014 WL 4744617 (N.D. Cal. Sept. 23, 2014) ...........24

*Vernazza v. SEC,*
  327 F.3d 851 (9th Cir. 2003) ....................................................................24

**FEDERAL STATUTES**

**Securities Act of 1933**

Section 2(a)(1)
  [15 U.S.C. § 77b(a)(1)]..............................................................................20

Section 2(a)(3)
  [15 U.S.C. § 77b(a)(3)]..............................................................................20

Section 17(a)
  [15 U.S.C. § 77q(a)] ............................................................................19, 20

Section 17(a)(1)
    [15 U.S.C. § 77q(a)(1)]............................................................22, 24

Section 17(a)(2)
    [15 U.S.C. § 77q(a)(2)]............................................................22, 24

Section 17(a)(3)
    [15 U.S.C. § 77q(a)(3)]............................................................22, 24

Section 20(b)
    [15 U.S.C. § 20t(b)]........................................................................18

**Securities Exchange Act of 1934**

Section 3(a)(10)
    [15 U.S.C. § 78c(a)(10)]................................................................20

Section 10(b)
    [15 U.S.C. § 78j(b)]..............................................19, 20, 22, 24

Section 21(d)
    [15 U.S.C. § 78u(d)]......................................................................18

Section 21(d)(5)
    [15 U.S.C. § 78u(d)(5)]................................................................31

**FEDERAL REGULATIONS**

Rule 10b-5
    [17 C.F.R. § 240.10b-5]..........................................................19, 20

Rule 10b-5(a)
    [17 C.F.R. § 240.10b-5(a)]..........................................................22

Rule 10b-5(b)
    [17 C.F.R. § 240.10b-5(b)]..........................................................22

Rule 10b-5(c)
    [17 C.F.R. § 240.10b-5(c)]..........................................................22

**CALIFORNIA BUSINESS AND PROFESSIONS CODE**

CA Bus. & Prof. Code § 26037.5(a).......................................................8

CA Bus. & Prof. Code § 26038(a)(1) ....................................................9

CA Bus. & Prof. Code § 26060 ..............................................................9

**ADELANTO MUNICIPAL CODE**

Adelanto Muni. Code § 17.80.080(d)(1)(A)........................................9

Adelanto Muni. Code § 17.80.080(d)(1)(U)........................................9

**<u>NEVADA REVISED STATUTES</u>**

N.R.S. § 678A.650.1 ......................................................................................................9

## I.  **INTRODUCTION**

The federal securities laws vest in this Court the power to enjoin, on an emergency basis, further violations of the law.  This Court also has the equitable authority to freeze the assets of securities law violators for the good of defrauded investors, appoint an equity receiver to marshal and preserve those assets and prevent further misuse and misappropriation by defendants, order defendants to provide a sworn accounting of their financial affairs, and prohibit them from destroying relevant documents.  *See, e.g.*, *SEC v. Horwitz*, No. 21-cv-02927-CAS-PD at Dkt. No. 18 (C.D. Cal. Apr. 6, 2021); *SEC v. King*, No. 20-cv-02398-JVS-DFM at Dkt. No. 12 (C.D. Cal. Dec. 28, 2020).  To put a stop to a fraudulent and ongoing stock offering by defendant Integrated National Resources, Inc. dba "WeedGenics" ("INR"), and its principals, Patrick Williams and Rolf Max Hirschmann (aka "Max Bergmann"), the SEC respectfully seeks that emergency relief from this Court.

From around June 2019 to the present, defendants raised more than $60 million from investors by means of a dissembled story of past success and future growth in the cannabis business.  They told investors that since 2017, INR had generated tens of millions of dollars in annual operating revenue year-over-year from INR's established cultivation operation in Las Vegas.  They told investors that their funds would be used to expand INR's business by developing a new Adelanto, California grow facility which, once up and running, would boost INR's revenues by more than $38 million annually.  And they told investors that this sustained history of profitable operations in Nevada, in tandem with INR's plans for expansion into California, presented an investment opportunity they could not miss.  According to defendants, an investment in INR was stable and the outsized returns INR promised – up to 36% per annum, with a full return of investor principal at the end of a five-year term – were all but guaranteed.  All of this was a lie.

Marijuana is a highly-regulated business.  State and municipal permits are required to legally operate a cannabis cultivation facility, yet California, Nevada, and

City of Adelanto permitting authorities have no record of INR lawfully operating within their jurisdictions.  If that were not enough, a forensic analysis of the INR operating accounts receiving the more than $60 million in investor funds confirms the fabulist quality of defendants' representations.  That analysis found no indicia of operational activity consistent with what INR claimed to defrauded investors.  Rather, the more than 20,000 fund transfers examined reflect no meaningful operational revenue or legitimately incurred expenses, nearly all funds received by the corporate INR accounts are comprised of investor funds, and the vast majority of those funds were dissipated by defendants in two ways:  (i) to make Ponzi-like payments; and (ii) to enrich themselves at the expense of defrauded INR investors.

The SEC now brings this civil enforcement action to halt INR's offering fraud in its tracks and prevent any further investor harm.

## II.   STATEMENT OF FACTS

### A.   Background

Since at least June 2019, INR has raised more than $61.7 million from about 350 investors.  Declaration of Stephen Bucci ("Bucci Decl.") at ¶ 36, Ex. 24.  The company – through defendant Hirschmann, INR's investor relations representative, and through defendant Williams, the INR vice president who executed investor agreements on INR's behalf – raised this eight-figure sum with an investment pitch that hundreds of investors found compelling:  INR was an established cannabis business with goals of expansion.  All of the representations defendants made when constructing this edifice of an investment thesis are false.

### B.   INR's Securities Offering

#### 1.   INR's website

INR maintained a public website that described INR (dba "WeedGenics") as a 100% vertically integrated "manufacturing partner of choice for CANNABIS and THC infused products."  Declaration of Christopher A. Nowlin ("Nowlin Decl.") at ¶ 10, Ex. 7.  On its investor page, the INR website touted a projected $7.7 billion dollar

market in California for cannabis, and represented, in a section entitled "Why invest with us?" that:

> We are a private company.  We are not subject to the volatility of stock markets.  Our cultivation facilities produce consistent positive cash flow regardless of key indexes/market activity … We are experienced cannabis growers.  With systematic laboratory level processes in place, our Las Vegas facility @ 52,000 sq. ft. consistently generates \$15MM annual revenue.  We have proven methods that will continue throughout the expansion of our new 150,000 sq. ft. facility, increasing revenue to \$54MM annually.  With exceptionally high margins, the company can offer a greater return on investment …

*Id*.  INR also identified potential investors for solicitation through listings it placed on online investment websites.  *Id.* at ¶ 4, Ex. 1 (Dale Tr.) at 16:1-17:22; ¶ 5, Ex. 2 (Taylor Tr.) at 20:9-21:15.

### 2.   Defendant Rolf Max Hirschmann aka "Max Bergmann"

From at least fall 2020 to fall 2022, defendant Hirschmann was investors' primary contact at INR.  He solicited potential investors by email, telephone, and in-person, provided them with INR's written offering materials, and in some instances, took investors on a personal tour of INR's purported Las Vegas cannabis growth facility.  *Id.* at ¶ 4, Ex. 1 (Dale Tr.) at 33:8-43:25; ¶ 14, Ex. 11 (Inv. Ex. 5); ¶ 5, Ex. 2 (Taylor Tr.) at 96:11-14.  Ominously, it was Hirschmann's perfidious practice to introduce himself to investors under a false pretense – he used a fake name, "Max Bergmann" – which had they known of, would have left them understandably disinclined to invest.  *Id.* at ¶ 15, Ex. 12 (Dale Decl.); ¶ 16, Ex. 13 (Idaho DOT photo identification); ¶ 5, Ex. 2 (Taylor Tr.) at 42:19-43:24; ¶ 4, Ex. 1 (Dale Tr.) at 36:15-37:3.

### 3.   INR's written offering materials

INR's written offering materials generally consisted of:  (i) an offering memorandum; (ii) an investment summary fact sheet; (iii) *pro forma* financials showing past financial performance and future projections; and (iv) an investment agreement executed by the investor and defendant Williams, on behalf of INR.

*INR's offering memorandum*:  Defendants represented that:

- "[I]n 2014 … INR invested in a **52,000 square foot grow facility** [in Nevada.] … Our current facility … with **52,000 square feet** in Las Vegas, NV generates consistent annual revenue reaching **$18 million**." *Id.* at ¶ 6, Ex. 3 at pp. 2, 9 (Inv. Ex. 24) (emphasis in original.)

- "With the explosion of California's Cannabis market, it is essential to cultivate and manufacture within the golden state borders … This new [Adelanto, CA] facility will encompass **150,000 square feet** and increase our gross revenue to **$54 million** annually … Production is expected at 100% by first quarter of 2023, with capacity to supply **100+ dispensaries** throughout southern California … The entire property has an approved Conditional Use Permit for Cultivation, Distribution, Testing and/or Manufacturing." *Id.* at pp. 9-10 (emphasis in original.)

- "Owners/Investors receive a fixed annual rate for duration of (minimum) five year term" ranging from 19.5% interest per annum for a minimum $25,000 investment to 28.5% interest per annum for investments of $375,000 and above. *Id.* at pp. 13-14.

- In addition to interest payments, if INR eventually sold the Adelanto facility, "all owners/investors shall be awarded a final settlement payment based on owners/investment portfolio value" equal to $82,500 for the minimum $25,000 investment, up to $1.25 million for an investment of $375,000. *Id.* at p. 15.

In its "Get To Know Us" section, INR's offering memorandum identifies the company's "Core Principals," listing defendant Williams as its Vice President and defendant Hirschmann ("Max Bergmann") as INR's Investor Relations executive. *Id.* at p. 17. *See also id.* at ¶ 8, Ex. 5 (Inv. Ex. 22); ¶ 4, Ex. 1 (Dale Tr.) at 102:13-104:3 (authenticating Inv. Ex. 22 offering memo); ¶ 6, Ex. 3 (Inv. Ex. 24); ¶ 5, Ex. 2 (Taylor Tr.) at 31:13-33:9 (authenticating Inv. Ex. 24 offering memo).

*INR's investment summary fact sheet*:  Defendants represented the company's actual financial performance to date, and separately provided future projections:

- "Company Segments – Operations Managed in Two Divisions:  Cannabis Cultivation [and] Retail Distribution … Total Gross Revenue:  $50.3 million." *Id.* at ¶ 7, Ex. 4 (Inv. Ex. 25) at p. 2.

- "Accounted" revenue of $14.9 million (2017), $15.197 million (2018), $15.329 million (2019), and $17.1889 million (2020) for INR's cultivation

business segment.  *Id.* at p. 5.

- "Accounted" revenue of $10.67 million (2017), $14.3 million (2018), $22.88 million (2019), and $33.1168 million (2020) for INR's retail/dispensary/distribution business segment.  *Id.*

- "Additional cultivation facility [in Adelanto, CA] will increase our annual revenue to $54 million" for cultivation business segment.  *Id.* at p. 3.

*See also id.* at ¶ 5, Ex. 2 (Taylor Tr.) at 46:1-48:24 (authenticating Inv. Ex. 25 investment summary).

   *INR pro forma financials*:  Apart from INR's investment summary fact sheet, defendants provided potential investors with *pro forma* financials that claimed to report INR's historical financial performance, as well as project its results going forward.  *Id.* at ¶ 12, Ex. 9 (Inv. Ex. 6) (INR financials – 10/20); ¶ 4, Ex. 1 (Dale Tr.) at 44:1-8, 45:6-17 (authenticating Inv. Ex. 6); ¶ 13, Ex. 10 (Inv. Ex. 26) (INR financials – 3/22); ¶ 5, Ex. 2 (Taylor Tr.) at 51:23-53:10 (authenticating Inv. Ex. 26). The detailed financials contained an array of operating figures, chief among them INR's gross revenue, cost of goods sold, operating expenses, resulting EBITDA, and profit margin on an EBITDA percentage basis.  *Id.*  Consistent with INR's other offering materials, the financials reported monthly revenues in excess of $1.3 million, and described these actual results as "ACCOUNTED" for.  *See*, *e.g.*, *id.* at ¶ 13, Ex. 10 (Inv. Ex. 26) (reporting "$22,313,040" in 2021 revenue from Las Vegas facility and "$16,609,092" in 2021 revenue from Adelanto facility).  Last, the financials claimed to record, in detail and to the dollar, more than a dozen cost and expense ledger items, including monthly amounts for rent, utilities, employees, laboratory testing and product certification, marketing, licensing and legal fees, repairs and "Mantenance," insurance, packaging, and shipping.  *Id.*

   *INR Investment Agreements*:  To memorialize their investment, defendants provided investors with written investment agreements for a five-year term that guaranteed fixed annual interest rates between 19.5% and 36%, with an option to

either renew for another five-year term at the conclusion of the contract period or receive a return of their principal in full. *See id.* at ¶¶ 25, 27-35, Exs. 17, 19-27 (investment agreements); ¶ 25, Ex. 17 (Dale Tr.) at 48:14-49:23 (authenticating Inv. Ex. 7); ¶ 26, Ex. 18 (Inv. Ex. 30 – Taylor agreement); ¶ 5, Ex. 2 (Taylor Tr.) at 68:8-70:4 (authenticating Inv. Ex. 30). Williams counter-signed INR's investment agreements for the company. *See id.* They all cross-referenced and incorporated by reference the terms of INR's offering memorandum and related materials, and expressly stated that the investment was "for the purpose of operating additional marijuana grow facility(s)." *See id.*

### 4.     INR's representations were material to investors

Having heard all of these representations, investors were convinced by defendants of several things. *First*, INR was an established business with a track record of operational results, owing to an existing Las Vegas cultivation facility that had generated annual revenues exceeding $10 million, year-over-year, since 2017. *See id.* at ¶ 5, Ex. 2 (Taylor Tr.) at 47:8-48:24, 53:11-54:18 (Taylor believed he was investing "into a profitable business that had sound financials for a return on our investment"); ¶ 4, Ex. 1 (Dale Tr.) at 45:18-47:7. *Second*, their funds were to be used by INR to expand on its Adelanto facility, which had obtained the necessary permits from local authorities and was already generating some degree of revenue. *Id.* at ¶ 5, Ex. 2 (Taylor Tr.) at 23:14-25:1, 25:11-23, 108:11-109:2 (development of Adelanto was "only permissible use" of funds invested); ¶ 4, Ex. 1 (Dale Tr.) at 20:14-23:11, 24:25-25:10, 95:14-22, 108:5-18 (same). *Third*, the claimed Las Vegas and Adelanto cultivation facilities were owned and operated by INR alone, and with no one else. *Id.* at ¶ 4, Ex. 1 (Dale Tr.) at 22:9-23:11 ("INR would be the company that would own those facilities. There was no other mention of any third-party or any other transference of company. It was all INR"), 39:3-40:13, 92:4-13; ¶ 5, Ex. 2 (Taylor Tr.) at 30:8-31:3, 84:9-85:5; ¶ 11, Ex. 8 (Inv. Ex. 4) (10/5/20 Hirschmann email to investor) ("Yes, both facilities are operated under Integrated National Resources

(INR)"). *Fourth*, and finally, because of INR's booming business prospects, investor returns were guaranteed. *Id.* at ¶ 5, Ex. 2 (Taylor Tr.) at 27:14-28:9, 59:7-60:9 (Bergmann claimed that INR had not missed an interest payment in 10 years of operations); ¶ 24, Ex. 16 (Inv. Ex. 27) (Bergmann email to investor) ("We want all investors to be confident and comfortable in their decision to invest … The company has never been late on payments/statements."); ¶ 4, Ex. 1 (Dale Tr.) at 26:11-30:2 (as communicated to Dale, interest payments were "absolutely" guaranteed).

All of these representations were significant to their decision to invest. INR's purported past operating results and future projections in its *pro forma* financial statements mattered to investors. *See id.* at ¶ 5, Ex. 2 (Taylor Tr.) at 40:21-42:5 (strong historical performance and high profit margins were a key part of investment pitch), 54:19-55:17, 109:18-110:6; ¶ 4, Ex. 1 (Dale Tr.) at 46:21-24 (important that financials have a basis). The claim that once developed, the new Adelanto facility would drive investor returns likewise spurred investment. *See id.* at ¶ 4, Ex. 1 (Dale Tr.) at 46:21-47:7; ¶ 5, Ex. 2 (Taylor Tr.) at 40:21-42:5, 53:11-21 (significant that Adelanto was expanding and "generating revenue and the general growth and upward trajectory" that INR had). The supposed revenue and established profitability of INR's Las Vegas facility mattered too. *See id.* at ¶ 4, Ex. 1 (Dale Tr.) at 32:21-33:7, 106:7-17; ¶ 5, Ex. 2 (Taylor Tr.) at 109:18-110:2. INR emphasized to investors that the Las Vegas and Adelanto facilities would be owned and operated by INR alone; this detail was crucial to them. *See id.* at ¶ 5, Ex. 2 (Taylor Tr.) at 85:1-5; ¶ 4, Ex. 1 (Dale Tr.) at 92:4-13. INR's guaranteed high returns enticed investors to invest. *See id.* at ¶ 4, Ex. 1 (Dale Tr.) at 27:25-28:3 (guaranteed returns a "huge factor"). Investors would never have invested with INR if, contrary to the company's representations, their money wasn't being used to develop an Adelanto cultivation facility. *See id.* at ¶ 5, Ex. 2 (Taylor Tr.) at 108:11-109:2 (Adelanto only permissible use of funds). They wouldn't have invested if they had known their money was being used for defendants' personal expenses. *See id.* at ¶ 5, Ex. 2 (Taylor Tr.) at 25:24-

27:13 (Taylor did not invest to fund anyone's personal expenses or lifestyle); ¶ 4, Ex. 1 (Dale Tr.) at 25:11-26:10 ("I would never pay for somebody to pay themselves. I'm there for an investment, not for them."). And they wouldn't have invested if they had known their money was being used to make Ponzi-like payments to other investors. *See id.* at ¶ 4, Ex. 1 (Dale Tr.) at 109:14-110:5 ("If I'd known that he was taking our money and paying other investors then … we're looking at a pyramid scheme/Ponzi scheme, and I'm done. I wouldn't even walk into something like that."); ¶ 5, Ex. 2 (Taylor Tr.) at 109:3-17 (using his funds to pay other investors "would be a scam and a fraud"). These representations, all unquestionably material, were without exception false.

### C. Defendants' Misrepresentations and Omissions to Investors

Evidence from Nevada and California state cannabis regulators and the City of Adelanto, all of whom have no record of defendants operating legally in their jurisdictions, and a forensic examination of INR's financial accounts, puts the lie to defendants' expansive claims. INR's cannabis cultivation and distribution business is pure fiction.

### 1. There is no record of INR legally operating any cannabis business in California, Nevada, or the city of Adelanto

Cannabis is a highly-regulated industry. Yet none of the relevant cannabis authorities at the state and local level have any record of INR lawfully operating in their jurisdictions.

*INR is not licensed in California*: Section 26037.5(a) of the California Business and Professions Code states that "[a] person or entity shall not engage in commercial cannabis activity without a state license issued by [the Department of Cannabis Control] pursuant to [the Medicinal and Adult Use Cannabis Regulation and Safety Act.]" CA Bus. & Prof. Code § 26037.5(a). Moreover, any person engaging in commercial cannabis activity without a license is subject to civil penalties of up to three times the amount of the license fee for each violation, with

each day of operation constituting a separate violation. CA Bus. & Prof. Code § 26038(a)(1). Cannabis cultivation is commercial activity that falls within the licensing requirement. *See* CA Bus. & Prof. Code § 26060, *et seq*. California's Department of Cannabis Control has no record of INR obtaining or even applying for a cannabis cultivation, manufacturing, retail, distribution, microbusiness, testing laboratory, or events license. Declaration of Charisse Diaz ("Diaz Decl.") at ¶¶ 1-6.

*INR is not licensed with the City of Adelanto*: Separate from the California state licensure requirement, Adelanto's municipal code provides that "Indoor adult-use and medical cannabis cultivation shall only be allowed upon application and approval of a Cultivation Permit and a [Conditional Use Permit] in accordance with the criteria and process set forth in" Adelanto's ordinance. Adelanto Muni. Code § 17.80.080(d)(1)(A). In any event, obtaining the necessary California state license is a separate and additional requirement for operating a cannabis cultivation business within Adelanto city limits. Adelanto Muni. Code § 17.80.080(d)(1)(U) ("An indoor adult-use and/or medical cannabis cultivation facility shall not manufacture, process, distribute, transport, sell, dispense, or administer cannabis from the facility, unless expressly and affirmatively authorized by State law <u>and</u> permitted by local law.") (emphasis added.) While the city of Adelanto is a municipal hub for state-legalized cannabis cultivation, INR never received required cannabis-related permits from the city, and Adelanto has no record of INR owning or operating any cannabis facilities within city limits. Declaration of Jaimie Lewis ("Lewis Decl.") at ¶¶ 1-8.

*INR is not licensed in Nevada*: Likewise, with respect to INR's supposed Las Vegas cannabis cultivation facility, under Nevada state law, "[a] person who does not hold a license and who, in violation of [Nevada law] … [c]ultivates, delivers, transfers, supplies or sells cannabis; … [m]anufactures, delivers, transfers, supplies or sells cannabis products; or … [a]dvertises the sale of cannabis or cannabis products … is liable for a civil penalty[.]" N.R.S. § 678A.650.1. INR is not licensed in any capacity with the Nevada Cannabis Compliance Board, as is required to legally

conduct a cannabis business in Nevada.  Declaration of David Staley ("Staley Decl.") at ¶¶ 1-14.  In fact, the Las Vegas cultivation facility that Hirschmann took certain investors to tour appears to be owned by an entirely distinct cannabis company with no official legal connection to INR or its principals.  *See* Nowlin Decl. at ¶¶ 18-23; *see also id.* at ¶ 4, Ex. 1 (Dale Tr.) at 31:17-32:18 (Bergmann told Dale his site visit had to start early and end no later than 9:00 a.m.).  It is thus inferable that Hirschmann's Las Vegas site visits with investors were part of an elaborate ruse to pass off an entirely different cannabis business as INR's own.

Obtaining and holding the regulatory licenses needed to legally operate are a prerequisite to any legitimate cannabis business, much less the experienced and vastly profitable one that INR depicted to its investors.  The fact that no regulator – neither state nor local – has any record of INR and its purported Las Vegas and Adelanto cultivation facilities demonstrates the company is a fraud.

### 2.    INR's bank accounts show no operating revenue, expenses, or other indicators of legitimate business activity

Second, a forensic analysis of INR's corporate accounts yields zero indicia of the thriving cannabis cultivation and distribution business described in its offering materials.  INR's investment summary claimed actual revenue in 2020 of $17,188,863 from its cultivation business, and $33,116,868 from its distribution business, for total annual revenue north of $50 million.  Nowlin Decl. at ¶ 7, Ex. 4 (Inv. Ex. 25) at p. 5.  In 2021, INR's *pro forma* financials claimed the company generated $38,922,132 in revenue from its cultivation business alone, including $16,609,092 from its nascent Adelanto operation.  *Id.* at ¶ 13, Ex. 10 (Inv. Ex. 26).  Further, the *pro forma* financials meticulously detailed a laundry list of expenses INR supposedly incurred in the course of its operations (among others, licensing fees).  These financial representations are false.  Account activity in the three INR financial accounts that received investor funds instead shows:

- No meaningful operating revenue – rather, the vast majority of incoming

funds are investments in INR being made by defrauded investors

- No payment of operating expenditures in a manner consistent with INR's *pro forma* financials – rather, the vast majority of outgoing funds were misappropriated by defendants (*see infra*)

- No indicia of a $16.6 million a year cultivation operation in Adelanto

- No indicia of a $22.3 million a year cultivation operation in Las Vegas

- No indicia of a $33.1 million a year distribution business

Bucci Decl. at § E, ¶¶ 41-43.  All told, INR's identifiable business expenses aggregated to at most 1.4% of the over $60 million the company raised from December 2019 through mid-April 2023.  *Id.*  The putative operating revenue and expenses exhaustively recounted in the *pro forma* financials that INR provided to its investors bear no relation to the thousands of funds transfers actually transacted in INR's corporate accounts.  The true picture painted by that account activity is quite different.  It's one of sustained and widespread misappropriation of investor funds.

## D.    INR, Hirschmann, and Williams's Scheme to Defraud

*June 2019 to October 2022 – $39 million raised and misappropriated*:
Between June 2019 and the end of October 2022, INR raised about $36.9 million from hundreds of investors.  *Id.* at ¶ 33.  In this time period, investors primarily sent their invested funds to an INR bank account controlled by defendant Williams.  Another bank account in the name of relief defendant West Coast Development LLC ("WCD") that Williams also controlled received a smaller amount from a few investors, approximately $2.3 million.  *Id.* at ¶ 34.  Thus, the $36.9 million raised was initially deposited to INR or WCD financial accounts under defendant Williams's control.  Williams then dissipated those investor funds through cash withdrawals, personal use, and by sending them on to a hodge-podge of bank accounts controlled by him, Hirschmann and relief defendants Michael Delgado and Tyler Campbell:

- Williams received at least $5,684,000 in investor funds, of which

11

$1,976,000 million was withdrawn in cash or transferred to Williams' personal accounts, $625,000 was spent on dining, jewelry, and adult entertainment, and $22,000 was spent on credit card payments (Bucci Decl. at ¶¶ 45, 64, and Ex. 25)

- Hirschmann and entities under his control received $15,673,000 in investor funds through direct transfers and cash withdrawals, of which much $4.8 million was spent on residential real estate, renovations, and related expenses, $2.4 million on luxury automobiles, and $3.2 million on credit card payments (Bucci Decl. at ¶¶ 48-53, 64, and Ex. 27)

- Relief defendant Delgado and his entities received $5,263,000 in investor funds (Bucci Decl. at ¶¶ 54-58, 64, and Ex. 32)

- Relief defendant Campbell and entities he controlled received $554,000 in investor funds (Bucci Decl. at ¶¶ 59-62, 64, and Ex. 36)

In addition, Williams used approximately $11.7 million in investor funds to make Ponzi-like payments to investors, nearly all of which were sourced from other investor money. *Id.* at ¶ 40.

*November 2022 to mid-April 2023 – Another $21 million raised and misappropriated*: Beginning in November 2022, INR's fundraising markedly accelerated. In that month, a bank account in the name of "INR-CA Investment Holdings" began transferring significant sums of investor funds to the primary INR bank account controlled by defendant Williams. The sole authorized signer for the INR-CA Investment Holdings account is relief defendant John Eric Francom, a dentist in Texas who holds himself out as a financial coach. Nowlin Decl. at ¶ 103. Since November 2022, Francom's INR-CA Investment Holdings has received roughly $21.05 million from INR investors, which it then sent to the primary INR account ($15.03 million) and another INR entity account in the name of relief defendant INR Consulting ($6.02 million). Bucci Decl. at ¶ 36. Relief defendant Campbell is the sole signatory for the INR Consulting bank account; the transition to INR Consulting from the primary INR account was likely prompted by Bank of

America's forced closure of INR's account in February 2023.  *Id.* at ¶¶ 25, 66, Ex. 21.

Defendants subsequently dissipated this $21.2 million in much the same way:

- Williams received another $3,708,000 in transfers to his personal account (Bucci Decl. at ¶ 45, 64)

- Hirschmann and entities under his control received an additional $7,271,000, which he again spent on luxury cars, credit card payments, real estate and renovations, and travel and entertainment (*id.* at ¶ 53, 64)

- Relief defendant Delgado and his entities received another $1,984,000 in investor funds (*id.* at ¶ 58, 64)

- Relief defendant Campbell received $537,000 through cash withdrawals and transfers to his personal accounts, while directing nearly $1 million to third parties for unclear purposes (*id.* at ¶ 59, 64)

And during this latter period, INR again robbed Peter to pay Paul, using at least $4.5 million of investor money received from INR-CA Investment Holdings to pay investor returns.  *Id.* at ¶ 40.

### E.   Defendants' "Lulling" Efforts

Even after their investment, INR continued to make misrepresentations to investors about its business.  Hirschmann inundated investors with email updates about INR's significant progress at the Adelanto facility and the new development's financial performance.  INR further engendered a false sense of investment security by providing investors with monthly account statements – detailing supposed real-time revenue figures and comparing that actual performance to INR's past operational results – and defendants encouraged investors to invest even more money with "invitation only," limited time offers in which INR would match their additional investment.  *See* Nowlin Decl. at ¶¶ 36-59, Ex. 28, Ex. 29 (Inv. Ex. 8) (03/24/2021 "Phase 3 is under way!" email), Ex. 30 (Inv. Ex. 9) (06/23/2021 "Phase 4 and going strong!" email), Ex. 31 (Inv. Ex. 10) (10/28/2021 "Invitation only – Phase 5 – Additional equity" email), Ex. 32 (Inv. Ex. 11) (03/24/2022 "Adelanto 2 (Phase 6, 7, 8) Revenue Share" email describing Adelanto 1 as "smashing success"), Ex. 33 (Inv.

Ex. 12) (03/25/2022 "Adelanto 2" email), Ex. 36 (Inv. Ex. 13) (06/02/2022 "Phases 9 & 10 + Last chance for revenue share" email), Ex. 37 (Inv. Ex. 14) (06/15/2022 "Phases 9 & 10" email), Ex. 38 (Inv. Ex. 15) (08/01/2022 "Extension on Revenue share option" email), Ex. 39 (Inv. Ex. 16) (08/19/2022 "Revenue Share" email), Ex. 34 (Inv. Ex. 28) (6/02/2022 "Phases 9 & 10 + Last chance for revenue share" email), Ex. 35 (Inv. Ex. 29) (June 2022 "Phases 9 & 10" email exchange), Ex. 18 (Inv. Ex. 30) (08/19/2022 "Revenue Share" email), Exs. 40-51 (bogus account statements claiming "INR REVENUE/HISTORY for "Adelanto 1 Revenue," "Adelanto 2 Revenue," "Las Vegas Revenue," and "Same Period Previous Year" figures).

### F.    Relief Defendants' Receipt of Investor Funds

The relief defendants in this case collectively received tens of millions of dollars of investor funds, and defendants and relief defendants transferred or shuffled substantial sums of investor money between a circuitous web of financial accounts under their control:



To summarize:

| Relief Defendant | Description | Approximate Investor Funds Received |
|---|---|---|
| WCD | Wyoming limited liability company formed in April 2019 and controlled by Williams as its sole manager and sole authorized signer on WCD bank accounts. (Nowlin Decl. at ¶ 87; Bucci Decl. at ¶¶ 11-12 ) | $15,275,000 (Bucci Decl. at ¶ 46, Ex. 26) |
| INR Consulting LLC (Wyoming Entity) ("INR Consulting/Williams") | Wyoming limited liability company that was formed in January 2023. Defendant Williams is the sole manager of INR Consulting/Williams and the sole authorized signer on the bank account in the entity's name. (Nowlin Decl. at ¶ 88; Bucci Decl. at ¶ 13) | $2,765,000 (Bucci Decl. at ¶ 44, Ex. 24) |
| Oceans 19 Inc. ("Oceans 19") | Wyoming corporation formed in August 2019 and controlled by Hirschmann as its sole owner and sole authorized signer on Oceans 19 Inc. bank accounts. (Nowlin Decl. at ¶¶ 89-90; Bucci Decl. at ¶¶ 14-15 ) | $22,206,000 (Bucci Decl. at ¶ 49, Ex. 28) |
| Autobahn Performance LLC ("Autobahn") | Wyoming limited liability company formed in controlled by Hirschmann as its sole member and manager; Hirschmann and his wife are signatories for its bank accounts. (Nowlin Decl. at ¶ 91; Bucci Decl. at ¶¶ 16-17 ) | $9,217,000 (Bucci Decl. at ¶ 50, Ex. 29) |
| One Click General Media Inc. ("One Click") | Nevada corporation formed in 2014; Hirschmann was the president of One Click General Media and the sole authorized signer on its bank account. (Nowlin Decl. at ¶ 94; Bucci Decl. at ¶ 19) | $801,000 (Bucci Decl. at ¶ 51, Ex. 30) |
| Opus Collective ("Opus") | Wyoming corporation formed in July 2020 and controlled by Hirschmann as its sole owner, president/direct, and sole signatory for its bank account. (Nowlin Decl. at ¶¶ 92-93; Bucci Decl. at ¶ 18 ) | $615,000 (Bucci Decl. at ¶ 52, Ex. 31) |
| John Eric Francom ("Francom") | Francom is the sole authorized signer on the bank account of INR-CA Investment Holdings, LLC, which received and then transferred investor funds to INR and INR Consulting, LLC. (Nowlin Decl. at ¶¶ 101-102; Bucci Decl. at ¶ 26) | $22,635,000 through INR-CA Investment Holdings, LLC (Bucci Decl. at ¶ 36, 62A, Ex. 39) |
| INR-CA Investment Holdings, LLC ("INR-CA") | Delaware limited liability company formed in October 2022; starting in November | $21,054,000 (Bucci Decl. at ¶ 36, |

15

| Relief Defendant | Description | Approximate Investor Funds Received |
|---|---|---|
| | 2022, bank account held in the entity's name began receiving millions of dollars of investor funds that it then sent to INR and INR Consulting, LLC. (Nowlin Decl. at ¶¶ 101-102, Exs. 93-94) | Ex. 40) |
| Michael Delgado ("Delgado") | Delgado is a resident of Orange, California, and is the sole manager of relief defendants Total Solution Construction LLC, Bagpipe Holdings LLC, and Bagpipe Multimedia LLC. He is the sole authorized signatory on multiple bank accounts opened in the names of those entities. (Nowlin Decl. at ¶¶ 95-98, Exs. 87-90; Bucci Decl. at ¶¶ 20-23) | $7,247,000 to Delgado and entities under his control (Bucci Decl. at ¶¶ 54-58, Ex. 32) |
| Total Solution Construction LLC ("Total Solution") | California limited liability company formed in July 2021 and controlled by Delgado as its sole manager and sole authorized signer on its bank accounts. (Nowlin Decl. at ¶ 95; Bucci Decl. at ¶ 20-21) | $3,867,000 (Bucci Decl. at ¶ 55, Ex. 33) |
| Bagpipe Holdings LLC ("Bagpipe Holdings") | Wyoming limited liability company formed in November 2019 and controlled by Delgado as its sole manager and sole authorized signer for its bank accounts. (Nowlin Decl. at ¶ 96; Bucci Decl. at ¶¶ 22) | $1,213,000 (Bucci Decl. at ¶ 56, Ex. 34) |
| Bagpipe Multimedia LLC ("Bagpipe Multimedia") | California limited liability company formed in November 2022 and controlled by Delgado as its sole member and manager. (Nowlin Decl. at ¶¶ 97-98; Bucci Decl. at ¶ 23) | $2,181,000 (Bucci Decl. at ¶ 57, Ex. 35) |
| Tyler Campbell ("Campbell") | Sole manager of relief defendant INR Consulting LLC and sole authorized signatory on INR Consulting's bank accounts. (Nowlin Decl. at ¶ 99; Bucci Decl. at ¶¶ 24-25) | $9,182,000 to Campbell and entities under his control (Bucci Decl. at ¶¶ 59-62, Exs. 36-38) |
| INR Consulting LLC (California Entity) ("INR Consulting/Campbell") | California limited liability company formed in December 2021 and controlled by Tyler Campbell as its sole manager, chief executive officer, and sole authorized signer on INR Consulting's bank accounts. (Nowlin Decl. at ¶ 99; Bucci Decl. at ¶¶ 24-25) | $9,080,000 (Bucci Decl. at ¶ 60, Ex. 37) |

| Relief Defendant | Description | Approximate Investor Funds Received |
|---|---|---|
| Hidden Springs Holdings Group LLC ("Hidden Springs") | California limited liability company that was formed in Orange in February 2023. Tyler Campbell is the sole manager of Hidden Springs. (Nowlin Decl. at ¶ 100) | $384,000 (Bucci Decl. at ¶ 61, Ex. 38) |
| Alexandria Porter Bovee ("Bovee") | Bovee, using the fake name "Aia Montgomery" communicated with INR investors beginning in fall 2022 to convince them to restructure their investments. (Nowlin Decl. at ¶¶ 60-79) | $715,000 (Bucci Decl. at ¶ 63, Ex. 40) |

## G.    Red Flags for the INR Offering and Defendants' Ongoing Misconduct

Last fall, in September 2022, an individual identifying herself as "Aia Montgomery" began to contact INR investors on the company's behalf to ask them to voluntarily restructure their investments. "Aia Montgomery" – who is in truth, relief defendant Alexandria Porter Bovee (*see* Nowlin Decl. at ¶ 61) – offered two options to INR investors:  (1) convert their INR investments into "preferred stock equity" for which they would no longer receive monthly interest payments; or (2) agree to a withdrawal arrangement with INR.  Nowlin Decl. at ¶ 60, Ex. 52 (Inv. Ex. 17) (9/2/22 Montgomery email); ¶ 4, Ex. 1 (Dale Tr.) at 78:16-80:2:2, 81:22-84:21; ¶ 66, Ex. 58 (Inv. Ex. 32) (10/22 Montgomery email); ¶ 5, Ex. 2 (Taylor Tr.) at 71:12-72:2, 74:6-75:1, 76:6-77:13, 87:9-90:12, 94:14-95:22.  Montgomery/Bovee told investors that a restructuring of their investment was needed because INR was in the early stages of going public.  *Id.*at ¶ 5, Ex. 2 (Taylor Tr.) at 77:14-78:13, 87:9-90:12.  In the end, INR refused to pay investors' principal back immediately, *id.* at 90:17-93:11, 98:3-102:12; ¶ 78, Ex. 70 (Inv. Ex. 41) (11/22 to 1/23 Montgomery emails); ¶ 75, Ex. 67 (Inv. Ex. 39) (10/22 to 12/22 Montgomery texts); ¶ 76, Ex. 68 (Inv. Ex. 40) (11/22 Montgomery texts), and only offered a gradual principal repayment over the course of years.  *Id.* at ¶ 77, Ex. 69 (Inv. Ex. 21) (12/8/22 Dale withdrawal agreement); ¶ 4, Ex. 1 (Dale Tr.) at 96:17-102:12.

1    In spite of all this, INR's website continues to be publicly available online, and

2    it still invites the public to contact INR about investing.  Press releases issued by INR

3    in January 2023 – entitled "Integrated National Resources inc. Continues

4    WeedGenics Expansions In 2023" – claim "yet another successful year of growth and

5    increasing profitability" and tout continuing expansion for "this industry-leading

6    corporation."  Nowlin Decl. at ¶ 80, Ex. 72.  In February and March 2023 alone, the

7    company raised another $5.8 million from investors.  Bucci Decl. at ¶ 62A.  While

8    investor funds raised dipped to about $205,000 in April, INR took on new investment

9    as recently as <u>April 18</u> (the last day reflected in monthly account statements produced

10   to the SEC).  *Id.*  Given defendants' rampant fraud to date, every additional dollar

11   invested by INR's unsuspecting victims risks an unredressable harm.

12   **III.    ARGUMENT**

13       **A.    The SEC Seeks a TRO in the Public Interest**

14       Because the SEC seeks a temporary restraining order in the public interest, it

15   must make only a *prima facie* case and show a likelihood of repeat violations to

16   secure that relief.  Section 20(b) of the Securities Act and Section 21(d) of the

17   Exchange Act authorize the SEC to obtain a restraining order without a bond.  *See* 15

18   U.S.C. §§ 77t(b) & 78u(d).  In the Ninth Circuit, emergency injunctive relief may be

19   ordered if there is "either (1) a combination of probable success on the merits and the

20   possibility of irreparable injury or (2) that serious questions are raised and the balance

21   of hardships tips in the applicant's favor."  *United States v. Nutri-Cology*, *Inc.*, 982

22   F.2d 394, 397 (9th Cir. 1992) (quotations and citations omitted).

23       The SEC appears before the Court "not as an ordinary litigant, but as a

24   statutory guardian charged with safeguarding the public interest in enforcing the

25   securities laws."  *SEC v. Management Dynamics*, *Inc.*, 515 F.2d 801, 808 (2d Cir.

26   1975).  Because this enforcement action is brought in the public interest, the Court's

27   "equitable powers assume an even broader and more flexible character than when

28   only a private controversy is at stake."  *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir.

1989) (quoting *FTC v. H.N. Singer*, *Inc.*, 668 F.2d 1107, 1112 (9th Cir. 1982).

Several district courts in the Ninth Circuit have interpreted the preliminary injunctive

relief standard in SEC emergency actions to require that the SEC make only a two-

prong showing: (1) a *prima facie* case that the defendant has violated the federal

securities laws, and (2) a reasonable likelihood that the defendant will repeat his

violations.[1]  The SEC has submitted compelling evidence to establish a *prima facie*

case that defendants have violated, and are continuing to violate, the antifraud

provisions of the federal securities laws.

> **B.     The SEC Has Made a *Prima Facie* Showing That INR, Hirschmann,
> and Williams Committed Securities Fraud**

Defendants INR, Hirschmann, and Williams engaged in a fraud in violation of

the antifraud provisions of Section 17(a) of the Securities Act, and Section 10(b) of

the Exchange Act and Rule 10b-5 thereunder.  Section 17(a) prohibits fraud in the

offer or sale of securities, and Section 10(b) and Rule 10b-5 prohibit fraud in

connection with the purchase or sale of any security.  *See* 15 U.S.C. § 77q(a); 15

U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852,

855 (9th Cir. 2001).  Defendants violated both antifraud provisions.

> **1.     Defendants offered and sold securities**

Defendants have offered and sold securities to investors, and, based on their

recent activities (*see* Statement of Facts at § II(F) *supra*), are continuing to do so.

Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule

10b-5 thereunder, make it unlawful, "in the offer or sale of securities" or "in

---

[1] *See, e.g., SEC v. Muehler*, No. 2:18-cv-01677-CAS-SK, WL 2018 WL 1665637 (C.D. Cal. Apr. 4, 2018); *SEC v. San Francisco Regional Center, LLC*, No. CV 15-2563-RS, 2015 WL 9694808 (N.D. Cal. Mar. 23, 2017); *SEC v. Capital Cove Bancorp, LLC*, No. 8:15-cv-00980-JLS-JC, 2015 WL 9704076, at *5-6 (C.D. Cal. Sept. 1, 2015); *SEC v. Pac. West Capital Group, Inc.*, No. 2:15-cv-02563-FMO-FFM, 2015 WL 9694808, at *4 (C.D. Cal. Apr. 7, 2015); *SEC v. Eadgear, Inc.*, No. 3:14-CV-04294-RS, 2014 WL 6900938, at *1 (N.D. Cal. Dec. 8, 2014); *SEC v. Schooler*, 902 F. Supp. 2d 1341, 1345 (S.D. Cal. 2012); *SEC v. Homestead Props., L.P.*, No. SACV09-01331-CJC(MLGx), 2009 WL 5173685, at *2 (C.D. Cal. Dec. 18, 2009); *SEC v. Trabulse*, 526 F. Supp. 2d 1008, 1012 (N.D. Cal. 2007).

connection with the purchase or sale of a security," to engage in any fraudulent conduct. Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, the term "security" includes any "investment contract." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). In *SEC v. W. J. Howey Co*., 328 U.S. 293, 298-99 (1946), the Supreme Court defined an investment contract to require: (1) the investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third-party. *See also SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003). In this judicial circuit, the "common enterprise" prong of the *Howey* test is satisfied by the existence of either horizontal commonality (pooling of investor funds and interests) or strict vertical commonality (linking of fortunes of investors with those of promoters). *SEC v. R.G. Reynolds Ent., Inc*., 952 F.2d 1125, 1130 (9th Cir. 1991) (Congress "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment.").

The INR offering satisfies the *Howey* test: INR investors invested money and expected to receive returns in the form of fixed interest rates, and in some cases equity or revenue sharing, from INR's successful cannabis cultivation business, through the managerial efforts of INR, which touted itself as having extensive industry experience. Horizontal commonality is present because investor funds were pooled with those of other investors to fund the development of INR's Adelanto facility, and strict vertical commonality is also present because the fortunes of investors and the INR promoters were linked because both were supposed to have achieved profits from INR's expansion into the California market.

Further, defendants INR, Hirschmann, and Williams's securities offering constitutes an "offer" and "sale" of securities for purposes of triggering the antifraud provisions of both Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Section 2(a)(3) of the Securities Act defines the term "sale" to include "every contract of sale or disposition of a security

1  or interest in a security, for value," and the term "offer" to include "every attempt or

2  offer to dispose of, … a security or interest in a security, for value."  15 U.S.C. §

3  77b(a)(3).  Similarly, the Exchange Act defines the term "sale" or "sell" to include

4  any contract to sell or otherwise dispose of [a security].  15 U.S.C. § 78c(14).

5            **2.    Defendants made material misrepresentations and omissions**

6            INR, Hirschmann, and Williams misrepresented and failed to disclose material

7  facts when raising money from INR investors.  To prove false and misleading

8  statements and omissions, in violation of both Section 17(a) and Section 10(b), the

9  SEC must show that defendants, with the requisite state of mind, made material

10  misrepresentations or omissions in connection with the purchase or sale of a security,

11  or obtained money by means of these false statements in the offer or sale of a security.

12  *See SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010).

13  Defendants' misstatements and omissions must concern material facts.  *Basic Inc. v.*

14  *Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Industries, Inc. v. Northway*, Inc., 426

15  U.S. 438, 449 (1976).  A fact is material if there is a substantial likelihood that a

16  reasonable investor would consider it important in making an investment decision.

17  *See Platforms Wireless*, 617 F.2d at 1092.  Liability arises not only from affirmative

18  representations but also from failures to disclose material information.  *See Dain*

19  *Rauscher*, 254 F.3d at 855-56.  The antifraud provisions impose "'a duty to disclose

20  material facts that are necessary to make disclosed statements, whether mandatory or

21  volunteered, not misleading.'"  *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996).

22            INR's representation that investor funds would be used to finance its expansion

23  into Adelanto, California, was false.  INR's claimed track record of financial

24  profitability from its Las Vegas, Nevada cultivation facility was false.  And because

25  its represented business was an outright fabrication, INR's claims that an investment

26  with the company was both stable and guaranteed to profit were false.  Williams

27  played a central role in these misrepresentations – he controlled the INR financial

28  accounts that received investor funds, and instead of directing that capital towards

legitimate business operations as represented, he misappropriated investor funds. Further, Williams made misrepresentations to investors because he signed INR's investment agreements, and those agreements explicitly incorporated by reference INR's offering memorandum and its related materials.  Hirschmann's role in INR's materially false and misleading statements to investors was just as significant.  He dealt with INR's investors directly, and was the primary source of the misinformation defendants peddled to them.  Last, defendants' false statements were incontrovertibly material.  Thus, defendants violated the misrepresentation provisions of Securities Act Section 17(a)(2) and Exchange Act Section 10(b) and Rule 10b-5(b) thereunder.

### 3.     Defendants engaged in a scheme to defraud

In addition to the material misrepresentations and omissions documented above, INR, Hirschmann, and Williams also engaged in a scheme to defraud.  Section 17(a)(1) of the Securities Act prohibits any person, "in the offer or sale of any securities," from employing "any device, scheme, or artifice to defraud," 15 U.S.C. § 77q(a)(1), or from engaging in "any transaction, practice, or course of business which operates, or would operate, as a fraud or deceit upon the purchaser," 15 U.S.C. § 77q(a)(3).  Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder make it unlawful for any person, "in connection with the purchase or sale of any security," "[t]o employ any device, scheme or artifice to defraud," or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  15 U.S.C. § 78j(b); 17 C.F.R. §§ 240.10b-5(a), (c).

To be liable for a scheme to defraud, a defendant "must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme."  *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008); *see also Middlesex Retirement Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1191 (C.D. Cal. 2007).  Under this "principal purpose and effect" test, an actor will be liable for a scheme to defraud if he or she participated in an activity with the

22

"principal purpose and effect of creating a false appearance of fact in furtherance of the scheme," in connection with the purchase or sale of securities. *Simpson*, 452 F.3d 1040, 1050. An individual may be liable for a scheme to defraud if he or she "committed a manipulative or deceptive act in furtherance of a scheme." *Id.* at 1048 (quoting *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997)).

INR, Hirschmann, and Williams's diversion of investor funds for their personal use is a hallmark scheme to defraud. *See, e.g., SEC v. Capital Cove Bancorp, LLC*, No. SACV 15-980-JLS (JCx), 2015 WL 9704076, at *6 (C.D. Cal. Sept. 1, 2015) (misuse of investor funds for personal expenses evidenced scheme to defraud); *SEC v. Wilde*, No. SACV 11–0315 DOC (AJWx), 2012 WL 6621747, at *6 (C.D. Cal. Dec. 17, 2012) (granting SEC's motion for summary judgment against defendant who diverted investor funds for business and personal expenses). Moreover, defendants' massive misappropriation of investor funds for their personal use is information investors would have found significant when deciding to invest. *See SEC v. TLC Invs. and Trade Co*., 179 F. Supp. 2d 1149, 1153 (C.D. Cal. 2001) (reasonable investors would consider information that their funds were being misused to be material); *Wilde*, 2012 WL 6621747, *5 (C.D. Cal. Dec. 17, 2012) ("there is no question a reasonable investor would consider it important that … the money paid for those securities would be misappropriated") (quoting *SEC v. Gallard*, No. 95 Civ. 3099 (HB), 1997 WL 767570, at *3 (S.D.N.Y. Dec. 10, 1997)).

Defendants' misappropriation of investor funds to make Ponzi-like payments – dressed up as investor distributions from profitable operations – also violated the scheme provisions of the federal securities laws. A Ponzi scheme is a scheme to defraud under the antifraud provisions. *See SEC v. Neman*, 2016 WL 6661174, *5 (C.D. Cal. Jul. 15, 2016); *Burnett v. Rowzee*, 561 F. Supp. 2d 1120, 1127-28 (C.D. Cal. Feb. 11, 2008) (payments of sham returns are deceptive acts that "allows the scheme's principals to continue to draw investments from other sources by creating the appearance of a viable investment opportunity"); *Donell v. Ghadrdan*, 2013 WL

23

692853 at *1 (C.D.Cal. Feb. 26, 2013) (a Ponzi scheme is "any sort of fraudulent arrangement that uses later acquired funds or products to pay off previous investors").

And finally, defendants' lulling efforts comprised a scheme to defraud.  The updates on INR's significant progress and current financial performance at Adelanto, bogus monthly account statements, and "invitation only" offers to further invest that Hirschmann showered investors with were engineered to perpetuate the INR fraud. These strained and fraudulent lulling efforts are yet an additional basis for scheme liability.  *See, e.g., SEC v. Holschuh*, 694 F.2d 130, 143 (7th Cir. 1982) ("[a] scheme to defraud may well include later efforts to avoid detection of the fraud."); *United States v. Shields*, No. CR12-00410, 2014 WL 4744617, at *4 (N.D. Cal. Sept. 23, 2014) ("post-investment misrepresentations designed to lull investors into a false sense that their investments are safe can constitute securities fraud"); *SEC v. Wang*, No. LA CV 13-07553 JAK (SSx), 2015 WL 12656906, *17 (C.D. Cal. Aug. 18, 2015).

### 4.    Defendants acted unreasonably and with scienter

INR, Hirschmann, and Williams all acted unreasonably and with scienter. While claims under Section 10(b) and Section 17(a)(1) require a showing of scienter, Sections 17(a)(2) and (3) only require a showing of negligence.  *See Aaron v. SEC*, 446 U.S. 680, 701-02 (1980); *Vernazza v. SEC*, 327 F.3d 851, 859-60 (9th Cir. 2003); *SEC v. Lyndon*, 27 F. Supp. 3d 1062, 1075 (D. Haw. June 13, 2014).  Scienter is proven with "'knowing or reckless conduct,' without a showing of 'willful intent to defraud.'"  *Vernazza*, 327 F.3d at 860; *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990).  To establish negligence, the SEC must show that the defendants failed to conform to the standard of care that would be exercised by a reasonable person.  *See Dain Rauscher*, 254 F.3d at 856; *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453–54 (3d Cir.1997) (defining negligence in the securities context as the failure to exercise reasonable care or competence).

Williams's scienter is manifest.  In the relevant period, he directed more than $10 million in Ponzi-like monthly distribution payments to investors, while at the

same time pillaging corporate accounts funded almost entirely with investor money for his personal use.  Given his exclusive control over INR's bank account, Williams knew or was reckless in not knowing that INR's business was a fraud.  For his part, the extent of Hirschmann's misappropriation of investor funds far surpassed what Williams took for himself – Hirschmann and entities under his control received over $22.9 million.  All the while, Hirschmann made direct misrepresentations to INR investors about the supposed health and abundant future of its cannabis cultivation business.  And so Hirschmann likewise knew or was reckless in not knowing that INR was a fraudulent enterprise.  Finally, Williams's scienter is imputed to INR because the scienter of an entity's management is imputed to the entity.  *See ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 477 (9th Cir. 2015); *see also SEC v. OwnZones Media Network, Inc.*, 2020 WL 13311398, *4 (C.D. Cal. Sept. 17, 2020) (imputing mental state where company employee had actual and apparent authority to communicate with and raise money from investors).  For the same reasons, defendants' conduct in materially misrepresenting INR's business to investors, and misappropriating investor funds for their personal use and to make Ponzi-like payments, was unreasonable and therefore negligent.

### 5. Relief defendants received investor funds for which they have no legitimate claim

Relief defendants collectively received millions of dollars in investor funds procured through INR's fraudulent offering and they have no legitimate claim to these funds.  The SEC may obtain equitable relief from relief defendants without charging them with any wrongdoing where they have (1) received ill-gotten funds, and (2) do not have a legitimate claim to those funds.  S*EC v. World Capital Market, Inc.*, 864 F.3d 996, 1003-04 (9th Cir. 2017) (citing *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998)).  It is not necessary for the person holding the property to have violated the securities laws, and courts may "exercise their broad equitable powers to order disgorgement from non-violating third parties who have received proceeds of

others' violations to which the third parties have no legitimate claim." *World Capital Market*, 864 F.3d at 1003; *see also SEC v. Baccam*, 2017 WL 5952168, at *6 (C.D. Cal. June 14, 2017).

Here, the first category of relief defendants consists of entities controlled by defendants Williams (WCD and the INR Consulting LLC entity formed in Wyoming ("INR Consulting/Williams")) and Hirschmann (Oceans 19, Autobahn Performance, One Click General Media, and Opus Collective). Defendants used these relief defendants as conduits for misappropriating well over $30 million of investor funds. The second category of relief defendants consists of Michael Delgado and entities under his control (Total Solution Construction, Bagpipe Holdings, and Bagpipe Multimedia), and Tyler Campbell and his INR Consulting/Campbell entity. From June 2019 to the present, Delgado and his entities received approximately $7,247,000 in investor funds, and Campbell and INR Consulting/Campbell received roughly $9,080,000. Both then took substantial amounts of these investor funds for personal use and for other purposes with no evident connection to any revenue-generating cannabis business, thus refuting any contention that they have legitimate claims to the funds. Significantly, Campbell, through INR Consulting/Campbell, personally directed Ponzi-like payments to INR investors in 2023. The third category of relief defendants consists of Eric Francom and his entity INR-CA Investment Holdings. Since November 2022, the INR-CA Investment Holdings bank account, controlled by Francom, has served as INR's primary vehicle for raising money, taking in roughly $21 million and passing most of it on to INR, while continuing to rapidly raise money into March 2023. Francom and INR-CA Investment Holdings are actively receiving significant amounts of investor funds that they then pass along to INR, where the funds are promptly dissipated. And last, relief defendant Bovee, in the guise of "Aia Montgomery," directly communicated with investors on behalf of INR to get them to restructure their investments. For her part, relief defendant Montgomery received over $715,000 in investor funds from INR over a period of just a few months.

**C.     A TRO Is Further Warranted Because Defendants Are Likely to Repeat Their Violations**

In addition to making a *prima facie* showing of defendants' securities law violations, the record also shows that there is a likelihood of irreparable harm to investors and prospective investors through the repetition of those violations and the dissipation of investor funds.  *See Absolute Activist Value Master Fund Ltd. v. Devine*, No. 2:15-cv-328-FJM-29DNF, 2015 WL 12838168 at *23 (M.D. Fla. July 1, 2015) (finding likelihood of irreparable injury to be great where defendant will continue to dissipate funds, thereby diminishing plaintiff's legal remedies); *SEC v. Blackwell*, No. 3:11-CV-0234-L, 2011 WL 13129084 at *2 (N.D. Tex. Feb. 11, 2011) (same).  Whether a likelihood of future violations exists depends upon the totality of the circumstances.  *See SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980); *Fehn*, 97 F.3d at 1295-96.  The existence of past violations may give rise to an inference that there will be future violations.  *See Murphy*, 626 F.2d at 655; *SEC v. United Financial Group, Inc.*, 474 F.2d 354, 358-59 (9th Cir. 1973).  Courts also consider factors such as the degree of scienter involved, the isolated or recurrent nature of the violative conduct, the defendant's recognition of the wrongful nature of the conduct, the likelihood that, because of the defendant's occupation, future violations may occur, and the sincerity of defendant's assurances (if any) against future violations. *See Murphy*, 626 F.2d at 655.

Here, all those factors are present.  Defendants engaged in a persistent pattern of fraudulent conduct when raising more than $61.7 million from investors since 2019.  Their fraud was egregious, and it in fact significantly accelerated just last November.  The scale and pervasive quality of defendants' dissipation of investor funds is not subject to reasonable dispute.  On balance, the necessity and appropriateness of an order enjoining them from further violations of the law is not a close call:  there is no reason to conclude that they will discontinue their fraudulent scheme, stop soliciting new investors, and stop misappropriating investor funds to

27

line their own pockets.  A temporary restraining order is warranted.

**D.  The Other Relief Sought by the SEC Is Needed**

**1.  The Court should issue an asset freeze**

An asset freeze may be ordered to ensure that a defendant does not dissipate his assets pending final judgment and to ensure that victims of the securities fraud are compensated.  *SEC v. Manor Nursing Ctrs., Inc*., 458 F.2d 1082, 1105-06 (2d Cir. 1972).  To obtain an asset freeze, the Commission need only establish that it is likely to succeed on the merits of its claims "as well as a likelihood that the claimed assets will be dissipated or that relief may otherwise be unavailable without this equitable relief." *SEC v. Alternate Energy Holdings, Inc*., No. 1:10-CV-00621-EJL-REB, 2014 WL 2515710 at *50 (D. Id. May 13, 2014) (citing *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009)) ("A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages if relief is not granted.");  *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998) (an asset freeze requires a lesser showing than a preliminary injunction in that the SEC must establish only that it is likely to succeed on the merits; the SEC need not show risk of irreparable injury)); *see also SEC v. Horwitz*, No. 21-cv-02927-CAS-PD at Dkt. No. 18 (C.D. Cal. Apr. 6, 2021); *SEC v. King*, No. 20-cv-02398-JVS-DFM at Dkt. No. 12 (C.D. Cal. Dec. 28, 2020).  Indeed, the Ninth Circuit has found that "the public interest in preserving the illicit proceeds [of a defendant's fraud] for restitution to the victims is great." *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999).  Courts have similarly recognized that a disgorgement order will often be rendered meaningless unless an asset freeze is imposed prior to the entry of final judgment.  *See SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990).

Notably, the Court's equitable authority to freeze assets extends over both parties and nonparties.  *See SEC v. Hickey*, 322 F.3d 1123, 1131 (9th Cir. 2003); *SEC v. Int'l Swiss Invest. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990).  That is because a freeze order is meant to prevent the dissipation of assets so that they may be available

28

to be paid as disgorgement for the benefit of victims of the fraud.  *See*, *e.g.*, *Hickey*, 322 F.3d at 1132 (affirming asset freeze over nonparty brokerage firm controlled by defendant to effectuate disgorgement order against defendant).

There is inescapable evidence that defendants dissipated investor funds here. The remaining funds within INR and relief defendants' control should be frozen to ensure that no further dissipation occurs, and that what remains is preserved for the benefit of defrauded investors.

### 2. The Court should appoint an equity receiver over INR and the entity relief defendants

District courts have broad discretion to appoint an equity receiver in SEC enforcement actions.  *See SEC v. Wencke*, 622 F.2d 1363, 1365 (9th Cir. 1980).  The breadth of this discretion "arises out of the fact that most receiverships involve multiple parties and complex transactions."  *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (quotation omitted).  Courts look to several factors in determining whether to appoint a receiver, including marshaling and preserving the assets and clarifying the financial affairs of the entities.  *Wencke*, 622 F.2d at 1372. Other courts have also looked to the integrity of management, the collection of revenue, and the need for proper distribution of investor funds.  *See, e.g., SEC v. Credit First Fund*, 2006 U.S. Dist. LEXIS 96697, *49-50 (C.D. Cal. Feb. 13, 2006).

A receiver may be appointed over assets held by, for the benefit of, or under the control of an individual defendant, as well as over a corporate entity.  *See, e.g., SEC v. Stanford*, No. 09-CV-0298 (N.D. Tex. Feb. 17, 2009) (appointing receiver to oversee assets owned or controlled jointly or individually by business entities and individual defendants); *see also In re Sanctuary Belize Litigation*, 408 F. Supp. 3d 650, 663 (D. Md. 2019) (ordering receiver to take exclusive custody, control, and possession of all assets held by or for the benefit of individual defendants that the receiver values at $1,000 or more); *FTC v. Business Card Experts, Inc*., 2007 WL 1266636 at *8 (Apr. 27, 2007) (ordering transfer of assets to receiver held

individually or jointly by any individual defendant, for the benefit of any individual defendant, or that are under the direct or indirect control of any individual defendant).

Here, a receiver is necessary to identify and manage assets held by defendants and relief defendants that may afford additional recovery for investors.  Defendants' fraud makes clear that can't be trusted with investor funds or assets.  A court-appointed receiver would serve the vital role of pursuing, locating, and recovering assets already dissipated by defendants, maximize investor recovery, manage a claims process, and assist the Court in ensuring that defendants' assets are distributed fairly to defrauded investors, under the supervision and direction of the Court.  The SEC also requests that the receiver be excused from posting a bond.  *See SEC v. Universal Financial*, 760 F.2d 1034, 1039 (9th Cir. 1985).

### 3. The Court should order an accounting, document preservation, and expedited discovery

The Court should also require defendants and relief defendants to prepare an accounting, so the SEC can identify all available assets to help ensure that funds and assets are frozen properly and available to satisfy any future order of disgorgement or civil penalties against them.  *See Wencke*, 622 F.2d at 1369; *Int'l Swiss*, 895 F.2d at 1276 (ordering an accounting); *SEC v. Billion Coupons, Inc.*, No. 1:09-cv-00068-JMS-KSC at Dkt. No. 12 (D. Haw. Feb. 18, 2009) (same).

The Court's broad equitable powers in SEC enforcement actions also include the ability to prohibit document destruction.  *See Wencke*, 622 F.2d at 1369.  Here, the SEC asks the Court to enter an order prohibiting the destruction of documents to prevent defendants (and relief defendants) from destroying any evidence of their violations and ongoing fraud.  *See*, *e.g.*, *SEC v. Horwitz*, No. 21-cv-02927-CAS-PD at Dkt. No. 18 (C.D. Cal. Apr. 6, 2021); *SEC v. King*, No. 20-cv-02398-JVS-DFM at Dkt. No. 12 (C.D. Cal. Dec. 28, 2020).  The SEC further requests expedited discovery in support of its application for preliminary injunction.  *Billion Coupons*, No. 1:09-cv-00068-JMS-KSC at Dkt. No. 12 (granting expedited discovery).  *Id.*

### 4. The Court should issue a conduct-based injunction against defendants Williams and Hirschmann

Further, the federal securities laws authorize "any equitable relief that may be appropriate or necessary for the benefit of investors, 15 U.S.C. § 78u(d)(5), which can include conduct-based injunctions to prohibit individuals from soliciting others to buy or sell securities." *SEC v. Moleski*, Case No. 2:21-cv-01605-SVW-E, 2021 WL 6752254, *5 (C.D. Cal. Oct. 21, 2021).  Plaintiff seeks a conduct-based injunction that would enjoin defendants in operative part from "participating in the issuance, purchase, offer, or sale of any security in an unregistered offering."  Because defendants' offering fraud continues to this day, this additional prophylactic relief is warranted.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the SEC respectfully requests that the Court grant the requested relief, and issue a temporary restraining and related orders, and order defendants to show cause why a preliminary injunction should not be entered.

Dated:  May 16, 2023                    Respectfuly submitted,

                                        */s/ Gary Y. Leung*
                                        DANIEL S. LIM
                                        CHRISTOPHER A. NOWLIN
                                        GARY Y. LEUNG
                                        Attorneys for Plaintiff
                                        Securities and Exchange Commission